FILED
United States Court of Appeals
Tenth Circuit

July 23, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SCOTT L. HOWARD,

      Plaintiff-Appellant,

v.

LLOYD WAIDE, Major; MARY
COX-BERGMAN, Major; MICHAEL
NEGLEY, Captain; JOHN R.
CLARKSON, Captain; NFN
HALLIGAN, Lieutenant; DAVID A.
BACKER, Lieutenant; ANTHONY A.
DeCESARO,

     Defendants - Appellees.

No. 07-1169

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 06-cv-00282-EWN-CBS)**

---

Jo Frances Walsh, Boulder, Colorado, (Alfred T. McDonnell, Hutchinson Black
and Cook, LLC, Boulder, Colorado with her on the briefs), for Plaintiff-
Appellant.

William V. Allen, Assistant Attorney General, Civil Litigation and Employment
Law Section, Denver, Colorado (John W. Suthers, Attorney General, with him on
the brief), for Defendants-Appellees.

Anthony A. DeCesaro, Defendant-Appellee, pro se, Colorado Springs, Colorado.

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

Scott L. Howard appeals the district court's dismissal of his 42 U.S.C. § 1983 civil rights action against several Colorado Department of Corrections ("CDOC") employees.[1] Howard alleges that defendants knew that he had been sexually assaulted by members of a prison gang, but despite this they failed to protect him from future harm by the gang. Although he reported his fears to prison officers and filed three administrative grievances, Howard later fell victim to two more sexual assaults facilitated by members of the same prison gang. He then brought this suit in federal district court alleging that defendants' deliberate indifference violated his Eighth Amendment rights.

A magistrate judge recommended that summary judgment be partially denied. The district court, however, granted summary judgment in full to defendants Captain John Clarkson, Lieutenant David Backer, and Lieutenant Halligan, officers at the Sterling Correctional Facility ("Sterling"), as well as others not party to this appeal. It also dismissed Howard's claims against Anthony DeCesaro, a grievance officer at a central CDOC office, pursuant to

_____

[1] Although Howard initially appealed pro se, this court subsequently appointed counsel and ordered supplemental briefing.

Federal Rule of Civil Procedure 12(b)(6).

We affirm the district court's grant of DeCesaro's motion to dismiss. As to Backer, Clarkson, and Halligan (the "Sterling defendants"), we hold that Howard proffered adequate evidence to create a genuine issue of material fact regarding their subjective knowledge of a significant risk of substantial harm. Reviewing appellees' alternate argument that Howard failed to exhaust his administrative remedies, we conclude that he has exhausted some, but not all, of his claims. We therefore reverse the district court's grant of summary judgment to Backer, Clarkson, and Halligan on Howard's exhausted claims.

**I**

**A**

Howard was convicted on a number of theft charges in Colorado and several other states. He was also convicted of tax code violations in federal court. According to Howard, his crimes were based on financial fraud involving substantial amounts of money, and these crimes garnered both local and national media attention. Howard describes himself as "a non-violent offender who is openly homosexual, of slight build, [and] unusually vulnerable to predators" and states that he "has no history of institutional behavior problems."[2] Howard began

---

[2] Howard's version of events is summarized from three documents presented to the district court: an initial complaint, an amended complaint, and a motion for a preliminary injunction. Because Howard swore, under penalty of

(continued...)

serving his Colorado prison sentence in October 2004 at the Fremont Correctional

Facility ("Fremont").  In December, members of a prison gang known as the

"2-11 Crew" recognized Howard from media reports about his crimes.  They

approached Howard and asked him to commit similar financial crimes for their

benefit.  Howard does not identify any of these gang members by their given

names, but alleges that an individual known as "Ghost" was largely responsible

for his problems.

Howard alleges that the gang members at Fremont eventually learned that

he was gay and began extorting money from him with threats of violence.  Ghost

soon made good on these threats, physically assaulting Howard on one occasion

and eventually forcing Howard into prostitution when he became unable to pay.

While at Fremont, Howard was sexually assaulted on three different occasions by

two different inmates.  Two of the assaults were ordered by Ghost as payment for

Howard's "debts" to the gang, and one of these occurred after Ghost threatened

---

[2](...continued)
perjury, that the statements in each of these documents were true, we may treat
them as affidavits to the extent that they allege facts within Howard's personal
knowledge.  See Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1019 (10th Cir.
2002).

Defendants make much of a few supposed inconsistencies between the two
complaints.  We have carefully reviewed the record and conclude that these
documents are, by and large, consistent, and that differences between them are
traceable mostly to the higher level of detail present in the initial complaint.  In
circumstances such as these, credibility determinations are properly left to the
jury.  See Tademy v. Union Pacific Corp., 520 F.3d 1149, 1159 (10th Cir. 2008).

Howard with a knife. Howard states that he unsuccessfully asked his Fremont case manager for protection from the gang but, fearing retaliation, did not tell him about the attacks that had already occurred.

After the third assault occurred, Howard contacted an attorney friend and told her that 2-11 gang members had approached him in Fremont. Howard did not tell the attorney about the sexual assaults because he feared retaliation. The attorney wrote a letter to Fremont prison officials asking that Howard be transferred to another facility and mentioning the gang by name. After prison officials received the letter and asked Howard for an explanation, however, Howard "broke down in tears" and told a case manager that he "had been assaulted." The case manager responded: "I don't want to hear the details of this."

Several days after his conversation with the case manager, Howard was transferred to Sterling for his protection. Upon arriving at Sterling on March 1, 2005, Howard met with an intake unit case manager. Howard told her that he had been transferred from Fremont because of sexual and physical assaults perpetrated by members of the 2-11 Crew. She cautioned Howard that "2-11 are everywhere and they have a grapevine." Clinical notes from Howard's medical intake also state that the "circumstances of [Howard's] transfer appear to have to do with custody issues with an STG [security threat group]," and note that he "talked briefly about his underlying anxiety regarding the circumstances of his transfer."

- 5 -

Based on our reading of the record, the Sterling facility is split into at least two separate parts: Sterling East and Sterling West. These parts are further subdivided into five "living divisions," which are "separated by security walls, secure sliders, and controlled hubs." Each division, in turn, is subdivided into "living units." Sterling West includes Living Units 1 through 4, which constitute two living divisions and are among the higher-security housing units. Howard's first permanent living assignment at Sterling was in Unit 2. There, he met with his permanent case manager and again "explained his ordeal with 2-11 Crew members" at Fremont. Although Howard told this official that 2-11 gang members had been a "serious problem for him in the past," necessitating his transfer to Sterling, he was "afraid to provide names or specific details."

Howard remained in Unit 2 for almost two months before prison officials moved him to Unit 33, which is in Sterling East. Sterling East apparently provides less supervision and fewer restrictions on contact between inmates than Unit 2. Immediately after arriving in the new unit, Howard saw a familiar face in the recreation yard: a 2-11 Crew member whom he recognized from his days at Fremont. This person saw Howard and told him that Ghost, the gang member who had been responsible for the threats to Howard at Fremont, "has a friend here" at Sterling.

Believing himself to be in danger, Howard immediately reported the contact to Backer, his case manager at the time. Howard told Backer that an

- 6 -

individual in the Sterling East recreation yard "had contact" with a 2-11 Crew member at Fremont who had "extorted him, threatened him with violence, forced him into prostitution, and attempted to recruit him for the sole purpose of financially assisting the gang."[3]  According to Howard, Backer did not take any steps to protect him, and instead told Howard that he could not be moved to another unit unless he named the specific individuals who threatened him and recorded a taped statement against them.  Because he had been threatened with a knife and assaulted by 2-11 Crew members in the past, Howard refused to name the inmates out of fear of retaliation.

Howard then began filing formal grievances with prison officials.  On April 27, 2005, Howard filed an initial, or "Step 1," grievance pursuant to CDOC Regulation 850-04.[4]  Howard's grievance summarized the gang's attempts to recruit him at Fremont for his expertise in carrying out financial fraud, but did not

---

[3] In fact, Howard alleges that he told Backer that he was aware of two 2-11 Crew members at Sterling.  He does not describe how or when he became aware of the second individual, but does state that he "did not encounter any problems at [Sterling] until his transfer to Living Unit 33."

[4] This regulation establishes a three-step administrative grievance process. At each step, the inmate is directed to limit the grievance to the space provided on a standard one-page form, although exhibits may be attached at Step 3.  Colo. Dep't of Corr. Reg. 850-04 § IV(B)(2)(a).  Step 1 grievances are investigated and answered by the "involved staff member" and another appointed staff member, while Step 2 grievances are investigated and answered by a CDOC administrative head or designee.  Id. § IV(C)(1)(a) & (b).  A designated grievance officer outside CDOC supervision responds to Step 3 grievances and may deny the grievance on either substantive or procedural grounds.  Id. § IV(C)(1)(c).

go into detail regarding threats of violence or prior sexual attacks. It explained:

> I had no problems on the West Side of [Sterling]. On April 27, 2005, I was transferred to . . . [Sterling]-East . . . . Immediately I became aware that 2 individuals on [Sterling]-East are in contact w/ 2-11 members at [Fremont]. I brought the situation to the attention of Case Mgr. Mr. Backer and made him privy to all related facts and history. Mr. Backer attempted to blame me for the situation telling me I should have maintained "a low profile." Mr. Backer further asserted that absolutely nothing could or would be done to prevent harassment unless I provided a taped statement against the 2-11 gang members. . . . I refused to give a statement and/or provide names out of fear of retaliation.

After defendant-appellee Clarkson received Howard's Step 1 grievance, a meeting occurred between Howard, Clarkson, Backer, and Halligan. During the meeting, Halligan allegedly told Howard that "[Sterling] is a prison and not a playground" and that he would "have to learn to live with" threats of violence. He also told Howard that "crime just doesn't pay."

Following the meeting, Clarkson denied Howard's grievance. Clarkson's response stated that following the meeting, "it was determined that [Howard] did not feel threatened at this time." Clarkson went on to explain that although Howard did not have to provide a taped statement, prison authorities "do have to have names," and Howard's assertion that he had problems with "two, 211 members, who wear green clothes is not enough." Expressing concern that prison officials might accidently move Howard into a cell with a gang member, he added that "[w]e cannot keep you away from all 211 members." Finally, Clarkson explained that moving him back to Living Unit 2 in Sterling West was not an

- 8 -

option, both because of the risk of moving Howard to a unit "where there could be problems," and because "[f]acility placement is classification and cannot be grieved."

On May 27, 2005, Howard followed up with a Step 2 grievance. This grievance asserted that Living Units 1, 2, 3, and 4 were physically separated from his current placement in Unit 33, and that inmates in Units 1 through 4 were restricted from any contact with inmates from other units. Moving him to any of these units, Howard explained, "could resolve this problem [without] requiring me to provide names . . . . I would not have ANY contact with [2-11 Crew members] whatsoever if I am housed on Units 1-4" (emphasis in original).

A different official responded to the second complaint, telling Howard that he "do[es] not get to select CDOC facility placement" and that Clarkson had made clear to Howard that he was not required to provide a taped statement, only inmate names. On June 11, 2005, Howard filed a Step 3 grievance. He first disputed whether he had been required to make a taped statement as a condition of obtaining protective measures, contending that "both Mr. Clarkson and Mr. Halligan advised me that I would be required" to provide a taped statement implicating 2-11 Crew members by name (emphasis in original). Howard's Step 3 grievance concluded:

> Though no physical harm has been done to me, I have experienced anxiety, depression, insomnia, etc as a direct result of the potential risks to my safety. I should not have to be subjected to such risks

when a solution is easily obtainable. Inmate transfers occur daily and are "routine" in the daily operations of CDOC. I request a transfer to another CDOC facility for my protection and to ease anxiety.

In early August 2005, while his Step 3 grievance remained pending, Backer moved Howard from Unit 33 to Unit 32, which was within the same living division. Backer told Howard that he was being transferred because he "filed too many grievances." Immediately after arriving in Unit 32, Howard was approached by a 2-11 Crew member who told him told that he would have to begin making "rent" payments of $25 a week in canteen items. About a week later, a 2-11 Crew member showed Howard a letter from Ghost that had been mailed from another prison. The letter purported to authorize Sterling gang members to make Howard "cover debts with his ass."

Three days after he was shown the letter from Ghost, Howard was physically and sexually assaulted in a prison bathroom by a 2-11 Crew member. Howard's complaint describes the assault in graphic detail. Following the assault, Howard states that he "remained sitting on the toilet for approximately 30 minutes crying, trembling, unable to move, and numb." Howard claims that he was "too afraid of retaliation to report the assault and, also, staff had thus far not expressed any interest in assisting him" and had begun referring to him as a "whiner."

On August 20, 2005, the same 2-11 Crew member and another inmate persuaded Howard to enter the gang member's cell, and the other inmate raped

- 10 -

Howard while the gang member stood watch in the hall. Howard's complaint also describes this incident in brutal detail.

A few days later, Howard was transferred to Tennessee on a detainer. When he returned to Sterling in October 2005, he was placed in Unit 22 for about a week, then transferred to Unit 4. For the rest of his time at Sterling, he remained in the Sterling West living divisions made up of Units 1-4. Howard suffered no further sexual assaults at Sterling, but alleges that 2-11 Crew members coerced him into participating in a tax fraud scheme for their benefit, and that he suffered a nonsexual physical assault. Authorities raided Howard's cell in January 2006, and he began cooperating with a federal investigation into the fraudulent scheme.

Around this time, on February 2, 2006, prison officials finally denied Howard's Step 3 grievance. Step 3 grievances are handled outside the prison at CDOC headquarters and are reviewed by Anthony DeCesaro, the CDOC Grievance Officer. Despite Regulation 850-04's requirement that the grievance officer must respond to each Step 3 grievance within 45 days, DeCesaro did not respond to Howard's grievance for approximately six months, although he did notify Howard that there would be a delay due to a grievance backlog.

When he eventually responded, DeCesaro offered a new rationale for requiring Howard to identify gang members by name, explaining that this requirement "is a safeguard to prevent any offender from making up such

- 11 -

accusations when it is their desire to just get moved." He denied Howard's request for a transfer by reiterating that "[h]ousing placement is a classification matter and not grievable." The response then explained: "It is your burden to prove the allegations stated in your Step 3 grievance. I have reviewed the facts of this case and determined that you did not meet this burden." Finally, DeCesaro told Howard that he had exhausted his administrative remedies on the matter.

Howard eventually provided several hours of taped statements implicating gang members, and was finally placed in administrative segregation the following day after "demanding" a transfer from a lieutenant who had not previously been apprised of his situation. By this time, he had been physically assaulted once again, had been briefly hospitalized due to panic attacks, and had paid over $3000 in extorted "fees" to gang members. On February 23, 2006, shortly after he filed his initial complaint in this matter, Howard was transferred to another Colorado facility for his protection.

**B**

Howard filed a pro se 42 U.S.C. § 1983 suit on February 8, 2006, claiming that prison officials acted with deliberate indifference to a known substantial risk of serious harm to his person. He sought monetary compensation and an injunction ordering defendants to consider placing him in an out-of-state facility.[5]

---

[5] Howard has since abandoned his request for injunctive relief. Howard's

(continued...)

In support, he provided a verified complaint, copies of his Step 1 and 2 grievances and Clarkson's response, and, eventually, other materials including his Step 3 grievance and DeCesaro's response, the letter from his friend to officials at Fremont, and records of his medical intake at Sterling. Defendants did not submit affidavits or any other evidence in response, save a copy of Regulation 850-04.

DeCesaro, the Step 3 grievance officer, filed a pro se motion to dismiss, asserting that he had not participated in any constitutional violation and lacked the authority to prevent or redress any such violation. The remaining defendants moved for summary judgment, or in the alternative, to dismiss. They argued that they were entitled to qualified immunity because Howard had failed to demonstrate a violation of his constitutional rights. They asserted that Howard had in fact been moved to the prison unit that he requested, and thus even under his version of the facts, there had been no constitutional violation. In the alternative, they urged that Howard had failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.

The district court referred the motions to a magistrate judge. The magistrate recommended that the complaint against DeCesaro be dismissed because he "cannot be held liable for an alleged constitutional violation for which

_____

[5](...continued)
counsel represents that he is now in federal custody.

- 13 -

he was not directly responsible." The magistrate recommended denying summary judgment to the Sterling defendants, however, concluding that a jury could infer that they were subjectively aware of a substantial risk to Howard's safety and thus were not entitled to qualified immunity. In addition, the magistrate found that Howard had exhausted his administrative remedies against the Sterling defendants as required by the PLRA. With regard to the remaining defendants, who are not parties to this appeal, the magistrate recommended that the district court grant summary judgment because Howard had not presented facts showing that they were aware of a significant risk of substantial harm.

Backer, Clarkson, and Halligan filed timely objections to the magistrate's report. Rejecting the magistrate's recommendation, the district court granted summary judgment to all moving defendants. Focusing on Clarkson's response to the Step 1 grievance, the court found that Howard had not been threatened at the point that he initiated the grievance process. It also concluded that Howard's claims that he reported contact with 2-11 Crew members in the recreation yard was insufficient to show that the Sterling defendants acted with deliberate indifference.

In addition, the district court reasoned that Howard's failure to adequately apprise prison officials of threats to his safety was "decidedly compounded by his refusal to identify the [Sterling] gang members who had approached him." Citing <u>Matzker v. Herr</u>, 748 F.2d 1142 (7th Cir. 1984), and <u>Smith v. Ullman</u>, 874 F.

Supp. 979 (D. Neb. 1994), the court found that Howard's claim was precluded because he had refused to identify a specific inmate who threatened him.

The court also granted DeCesaro's motion to dismiss, though on a different basis than that recommended by the magistrate. Like the other defendants, the court found that DeCesaro was unaware of any threat to Howard and thus did not act with deliberate indifference.

Howard now appeals the district court's judgment as it relates to Backer, Clarkson, Halligan, and DeCesaro. Our jurisdiction arises under 28 U.S.C. § 1291.

## II

We review orders granting summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. See Habecker v. Town of Estes Park, 518 F.3d 1217, 1223 (10th Cir. 2008). Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Sterling defendants moved for summary judgment on the basis that they were entitled to qualified immunity. Claims of qualified immunity implicate the two-step inquiry of Saucier v. Katz, 533 U.S. 194 (2001). "After a defendant invokes qualified immunity, the plaintiff in a case like this one, which alleges a violation of the Eighth Amendment, must demonstrate that the defendants[']

actions violated a specific constitutional right." Mata v. Saiz, 427 F.3d 745, 749 (10th Cir. 2005) (citing Saucier, 533 U.S. at 201). "If the plaintiff meets this initial burden, [he] must then show that the constitutional right was 'clearly established' prior to the challenged official action." Id.

## A

## 1

We begin by considering whether Howard has alleged a constitutional violation. Howard's claims arise from the Eighth Amendment's prohibition against cruel and unusual punishment, which encompasses deliberate indifference by prison officials. Estelle v. Gamble, 429 U.S. 97, 105 (1976). We analyze his claims under Farmer v. Brennan, 511 U.S. 825 (1994). Farmer is not only controlling authority in deliberate indifference cases, but is also particularly instructive here because it contains significant factual parallels to the present case.

The plaintiff in Farmer was a biologically male, preoperative transsexual who, several years into his federal sentence, was transferred to a higher-security facility and placed in the general male prison population. Id. at 829-30. He "voiced no objection to any prison official about the transfer to the penitentiary or to placement in its general population." Id. at 830. Two weeks later, he was beaten and raped by another inmate in his cell. Id. In subsequent proceedings, the district court granted summary judgment to the defendant prison officials, and

the Seventh Circuit summarily affirmed.  Id. at 831-32.

Vacating and remanding, the Supreme Court confirmed that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  Id. at 833 (quotation and alteration omitted).  The Court held that a failure to meet this duty violates the Eighth Amendment only when two requirements are met.  First, the alleged deprivation must be "sufficiently serious" under an objective standard.  Id. at 834 (quotation omitted).  In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective "substantial risk of serious harm."  Id.; see also Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006).

Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm.  In other words, an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  This knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842 (citation omitted).  Providing a salient example, the Court observed:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known

- 17 -

about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Id. at 842-43 (quotations omitted).

Continuing its explanation of the subjective prong, the Court warned that prison officials cannot escape liability merely by claiming that they "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Id. at 843. For Eighth Amendment purposes, "it does not matter whether the risk comes from a single source or multiple sources . . . ." Id. Nor does it matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. The Court cautioned that "the District Court may have placed decisive weight on petitioner's failure to notify respondents of a risk of harm" even though "the failure to give advance notice is not dispositive," and remanded for application of the proper deliberate indifference standard. Id. at 848.

**2**

We apply the first prong of Farmer, regarding the objective appearance of risk. The district court assumed without deciding that Howard's complaint sufficiently established an objective risk of serious harm. Defendants do not concede that this requirement was met, however, arguing that we may affirm the grants of summary judgment and dismissal by deciding that Howard did not face

an objective "substantial risk of serious harm."

According to Howard, while at Fremont he was individually targeted by a notorious prison gang because of his build, his sexual orientation, and the nature and visibility of his crimes. He was then threatened, sexually assaulted, and prostituted against his will by members of this gang, and was later transferred to Sterling for his own safety. Shortly after moving to the East side of Sterling, Howard was identified by a member of the same prison gang who had repeatedly assaulted Howard in the past. That individual told Howard that "Ghost," the very individual who had orchestrated the past threats and assaults, was in contact with inmates at Sterling. All the while, Howard was housed in a less-restrictive area of the prison where he alleges it was easier for gang members to assault him. The question then, is whether these events establish an objective, substantial risk of serious harm to Howard at Sterling. We conclude that the evidence, viewed in the light most favorable to Howard, does present an objective substantial risk that he would experience harm.

Of course the harm of sexual assault is "serious" enough to have Eighth Amendment implications. See Farmer, 511 U.S. at 853 (Blackmun, J., concurring) ("Prison rape not only threatens the lives of those who fall prey to their aggressors, but is potentially devastating to the human spirit."); Gonzales v. Martinez, 403 F.3d 1179, 1186 (10th Cir. 2005) ("[A] plaintiff's uncontroverted claim of deprivations resulting from sexual assault [is] sufficiently serious to

constitute a violation under the Eighth Amendment."). Howard has therefore satisfied Farmer's objective prong.

**3**

The closer question—and the point of disagreement between the district court and the magistrate judge—is whether Howard has established the subjective element of his deliberate indifference claim.

In conducting its inquiry into defendants' subjective knowledge, the district court apparently misunderstood Howard's burden under Farmer. The court's reasoning indicates that it expected an inmate claiming deliberate indifference to demonstrate that he personally provided officials with written notice of the specific risk he faced. As explained, Farmer clearly states that an affected inmate need not provide written notice of a threat in order to trigger official's duties under the Eighth Amendment. 511 U.S. at 849. Regardless of how prison officials become subjectively aware of a substantial risk of serious harm to an inmate—and indeed, even in situations where the prisoner himself remains oblivious to the potential harm—the Eighth Amendment requires them to respond reasonably. Moreover, the facts presented in Howard's complaint reveal that he did provide notice of his fears in both meetings and grievances. The district court was therefore in error when it concluded that the written notice Howard provided was insufficiently detailed and relied upon that conclusion as a basis for summary

judgment.[6]

Having clarified the appropriate standard, we consider the evidence of subjective knowledge on the part of the Sterling defendants. Although the details of what Howard told each individual defendant are certainly relevant as evidence of their knowledge, we cannot place "decisive weight" on such evidence, Farmer, 511 U.S. at 848; we must instead begin by considering the background information that might inform prison officials of "obvious risks" to Howard, id. at 842. It is against this circumstantial backdrop that the district court should have considered Howard's direct evidence of what he told prison officials.

Howard describes himself as openly gay and slight of build, characteristics that a jury could infer were obvious to the Sterling defendants and from which a jury could conclude that they knew he was particularly vulnerable to assault. In addition, Howard alleges that the 2-11 Crew was a well-known and notorious prison gang and that defendants were subjectively aware of the general dangers

---

[6] To the extent that the district court relied almost exclusively on the information in Howard's grievances when evaluating defendants' subjective knowledge, the court may have blurred the strict requirements of the PLRA and the bounds of our inquiry into an alleged constitutional violation. The PLRA, requires prisoners to follow administrative grievance procedures before filing suit in federal courts. See 42 U.S.C. § 1997e. It does not, however, change the constitutional mandates of the Eighth Amendment. The purpose of the PLRA's exhaustion requirement is simply to provide authorities with "a fair opportunity to investigate and resolve [a prisoner's] complaint internally . . . ." Kikumura v. Osagie, 461 F.3d 1269, 1284 (10th Cir. 2006). These grievances are one way in which prison officials may become aware of risks to a prisoner, but they are not the only way. We will address the separate question of exhaustion below.

the group presented, based on their knowledge of past incidents of "bodily harm, including alleged murder" by 2-11 Crew members in Colorado prisons. From a prison document in the record, it appears that CDOC has even deemed the 2-11 Crew an "STG," or security threat group. These alleged facts, standing alone, provide circumstantial evidence of defendants' subjective knowledge that approaches the entire record in <u>Farmer</u>. Although <u>Farmer</u> did not hold that such evidence alone would have been sufficient to survive summary judgment, neither did the record "so clearly establish [prison officials'] entitlement to judgment as a matter of law on the issue of subjective knowledge that [the Court could] simply assume the absence of error below." <u>Farmer</u>, 511 U.S. at 848. The circumstantial background evidence presented by Howard, although it would not necessarily be sufficient to meet his burden if standing alone, should have weighed more heavily in the district court's evaluation of the record.

This brings us to Howard's direct evidence of the Sterling defendants' knowledge. As the district court acknowledged, "the evidence suggests that [the Sterling defendants] were aware of the brutal treatment [Howard] suffered at the hands of gang members at [Fremont]." It nonetheless seemingly disregarded this fact in concluding that Howard had not provided enough detail to prove subjective knowledge. In doing so, the court did not view the evidence in the light most favorable to Howard and failed to view the evidence in context.

For example, the district court focused on snippets of text in Howard's

grievances to the exclusion of Howard's other allegations, noting at one point that his "Step One Grievance entirely fails to mention past violence at the hands of Gang members." Howard's failure to mention violence in his grievance is not dispositive, however, as he provides evidence supporting an inference that the Sterling defendants became aware of this past violence through other channels.[7] Howard alleges that he described his experiences at Fremont to Backer in person, prior to the meeting between Howard and the other Sterling defendants. Howard told Backer that gang members at Fremont had "threatened him with violence" and "forced him into prostitution." He identified 2-11 as the prison gang responsible for this treatment, and implicated "Ghost" as the individual most responsible. He then explained to Backer that "Ghost" was in contact with individuals at Sterling. This evidence supports a finding that Backer was subjectively aware of the past violence and the possibility of future violence.

In addition, Howard's description of his conversation with Backer supports an inference of subjective knowledge on the part of Clarkson and Halligan, who met with Backer and Howard shortly after the conversation. Because the very purpose of the meeting was to discuss Howard's perception of a threat to his safety, a jury could infer that Backer, or Howard himself, reported his specific understanding of Howard's experiences at Fremont to Clarkson and Halligan.

---

[7] In each of his three grievances, Howard used the entire space available to him on the prison's standardized grievance form.

Moreover, during the meeting, Halligan allegedly told Howard that he "would have to learn to live with" risks to his safety and that "crime just doesn't pay," suggesting that he and the other defendants were aware that such risks existed but thought that they were the natural consequences of Howard's criminal conduct.

In support of its finding that defendants lacked subjective knowledge of a threat even after this meeting, the district court quoted Clarkson's response to Howard's Step 1 grievance, issued after the meeting took place. The response stated that "[y]ou told us you have not been threatened, at this point . . . ." Contrary to the district court's conclusion, this statement at <u>most</u> establishes that Howard told the Sterling defendants that the 2-11 Crew members he encountered in the exercise yard had not yet explicitly threatened him with violence. But prison officials may be aware of a substantial risk of harm even where no outright threat has occurred. Howard has presented circumstantial evidence that all prison officials were aware of the general threat of 2-11 violence and that they knew Howard had characteristics that made him a likely target of such violence. Even more importantly, he has presented direct evidence that the Sterling defendants knew Howard had been assaulted by the 2-11 Crew in the past and had recently been recognized and approached at Sterling by members of the same gang. Under these circumstances, Howard has produced sufficient evidence to survive summary judgment regarding the Sterling defendants' subjective knowledge.

**4**

Although we have concluded that, for summary judgment purposes, Howard meets the objective risk and subjective knowledge elements of Farmer, there is one remaining hurdle:  Farmer explains that because the Eighth Amendment requires only "reasonable safety," prison officials who "actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844-45 (quotation omitted).  "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly [or] recklessly declined to act."  Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 620 (11th Cir. 2007) (quotation omitted); see also Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997) (requiring plaintiff to "demonstrate that the defendants either took no precautions to avoid a known hazard which the gang presented, or that the precautions they took ignored the risk which targeted inmates faced").  In determining whether prison officials acted reasonably, we consider what actions they took, if any, as well as available alternatives that might have been known to them.  See, e.g., Tafoya v. Salazar, 516 F.3d 912, 918 (10th Cir. 2008) ("A prison official may be liable for a substantial risk of serious harm to inmates . . . if he intentionally refuses other reasonable alternatives and the dangerous conditions persist."); Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999) (concluding that although prison officials knew of the

- 25 -

plaintiff's HIV-positive status, their failure to prescribe a protease inhibitor was reasonable because they treated him with two other drugs).

Summary judgment was granted in part because Howard refused to identify the individuals who had approached him in the prison yard or other specific members of the 2-11 Crew. The district court concluded that this refusal excused any failure of action by the Sterling defendants. Its order, however, relied only on two cases which are no longer good law. It cited Matzker, 748 F.2d at 1150, holding that a "prisoner must identify who is threatening him" before an Eighth Amendment violation can occur, and Smith, 874 F. Supp. at 984, stating the same proposition. But if a prisoner is not always required to give authorities notice of a threat, he is certainly not required to give notice of who precisely is behind the threat; Farmer explicitly holds that "the Eighth Amendment imposes no such requirement."[8] 511 U.S. at 849 n.10. The district court's reliance on Matzker, which predated Farmer, and Smith, which was vacated "in light of Farmer," Smith v. Ullman, 874 F. Supp. 979, 987 n.1 (D. Neb. 1994), was in error.

In this case, however, Howard identified a group of prisoners who were a threat to his safety, the 2-11 Crew. This is not a situation where there is a complete lack of evidence suggesting that prison officials were aware of the gang,

---

[8] Howard's case illustrates one reason not to impose such an absolute prerequisite. He contends that he had "no way of naming each and every member of the 2-11 Crew. Thus, he [could] not accurately advise CDOC staff of potential threats."

or any of its members.  To the contrary, construing the facts in the light most favorable to Howard, the Sterling intake unit case manager warned Howard that "2-11 are everywhere and they have a grapevine."  Howard also contends that media reports have documented the gang's activities, and that the prison has a full-time intelligence officer/gang coordinator who maintains a database concerning known gang affiliation.  Howard should be allowed to prove his case at trial.

If defendants knew that the 2-11 Crew had targeted Howard and sexually assaulted him in the past, they had a constitutional duty to consider all reasonable means of protecting Howard.  See Tafoya, 516 F.3d at 918.  Viewing the facts in the light most favorable to Howard, the uncontroverted record establishes that prison officials may have had reasonable responses available to them, despite Howard's fear of "naming names."

Howard's grievances advised prison officials that he could be protected by moving him to a more restrictive housing unit in another section of the prison.  When that request was twice denied, he also asked that they transfer him to an out-of-state prison facility for his protection.  Because prison officials chose to present absolutely no pertinent evidence to the district court, we must accept Howard's allegations that these alternative solutions might have been reasonable means of protecting his safety.  But the Sterling defendants did not transfer Howard within the prison or consider any other method of protecting him, such as

protective custody or the requested transfer to an out-of-state facility. Nor did they present depositions, affidavits, or any other evidence to the district court that would foreclose a material dispute regarding the feasibility of such responses. Instead, they presented a set of conflicting rationales for their chosen course of action: doing absolutely nothing to protect Howard.

For example, several of the Sterling defendants offered a blithe explanation that housing classifications are "not grievable." Because prison officials are required to take reasonable protective action once a risk comes to their attention, such an explanation does not satisfy the defendants' Eighth Amendment duties because the limitations of prison grievance procedures cannot override constitutional duties. Prison officials also claimed that they feared moving Howard into a cell with a gang member. Yet in the Step 3 response, DeCesaro explained that the policy requiring Howard to name his attackers was actually designed to root out inmates who "mak[e] up such accusations when it is their desire to just get moved." Neither of these responses demonstrates that the Sterling defendants were <u>unable</u> to transfer Howard. To the contrary, Howard alleges that Backer in fact <u>did</u> transfer him—not to an area in Sterling West where Howard thought he would be safe, but rather within his living division in Sterling East, where Howard was almost immediately raped following the transfer.

Besides defendants' failure to attempt the remedies identified by Howard, statements in the record reveal that their failure to act may not have been

premised on an inability to do. Clarkson wrote to Howard that "[w]e cannot keep you away from all 211 members" and that "[f]acility placement is classification and cannot be grieved," and Halligan allegedly told Howard that he "would have to learn to live with" risks to his safety and that "crime just doesn't pay." Backer also allegedly told Howard that his recourse was to maintain "a low profile." If the Sterling defendants in fact made these statements despite knowledge that Howard had been sexually assaulted by a specific prison gang that had now found him at Sterling, a jury could reasonably conclude that they declined to respond in an objectively reasonable manner. Howard's allegations create genuine issues of material fact as to whether defendants' response was constitutionally reasonable.

**5**

In sum, we agree with the magistrate judge that, under the dictates of Rule 56, Howard has presented adequate evidence to survive summary judgment. The district court mistakenly relied on the absence of an <u>explicit</u> threat to Howard at Sterling, and on Howard's refusal to identify gang members by name, to the exclusion of circumstantial evidence that would allow inferences to be drawn in Howard's favor regarding the Sterling defendants' state of mind and the reasonableness of their actions. In the absence of any evidence to the contrary, these inferences must rule the day. "The undisputed evidence of the physical assaults on [Howard,] set against the facts of [prison officials'] knowledge of reported risks to [his] safety," <u>Gonzales</u>, 403 F.3d at 1187, require us to conclude

- 29 -

that the district court's grant of summary judgment for the Sterling defendants on Howard's Eighth Amendment claim was improper.

To be sure, if it were truly impossible for prison officials to protect Howard—due to his refusal to name gang members or for other reasons—he would have no Eighth Amendment claim. Recognizing as much, the district court expressed concern that an inmate might "avail himself of the grievance system, throw a monkeywrench into its gears, and then decry its failure to serve him," and we would certainly not endorse a rule allowing relief for inmates who complain of threats to their safety, but make it impossible for prison officials to rectify them. That, in the words of former New Mexico Governor Bruce King, would "open a box of Pandoras" uncontemplated by Eighth Amendment case law.

To keep that box firmly closed, we emphasize the narrowness of our holding today. If a prisoner faces a threat from a specific individual or individuals, it may well be impossible for prison officials to respond without knowledge of their identities. Likewise, if a prisoner's refusal to "name names" leaves prison officials without knowledge that the prisoner is actually in danger, <u>Farmer</u>'s actual knowledge prong would not be satisfied. Howard's claim survives because he has presented evidence, both direct and circumstantial, that prison officials <u>knew</u> he faced an ongoing risk from a prison gang with a substantial presence in the facility, and that they had reasonable responses available to them. We also note that Howard has presented a reasonable

explanation for refusing to identify the individuals who approached him in the prison yard—claiming that identifying and providing a taped statement against one or two 2-11 Crew members would subject him to retaliation from other members of the gang. Without evidence of actual knowledge and the availability of reasonable responses, a prisoner's specific vulnerabilities, whether related to physique, sexual orientation, or other characteristics, will not alone form the basis for a cognizable Eighth Amendment claim.

B

Sterling defendants contend that they are nonetheless entitled to qualified immunity because the constitutional right that Howard invokes has not been clearly established by prior controlling precedent or the overwhelming weight of authority in other circuits. See Saucier, 533 U.S. at 201; Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). The Supreme Court and the Tenth Circuit have repeatedly and unequivocally established an inmate's Eighth Amendment right to be protected from substantial risks of sexual assault by fellow prisoners. See, e.g., Farmer, 511 U.S. at 833-34; Gonzales, 403 F.3d at 1186; Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir. 1980) ("[A]n inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates."). Accordingly, these defendants are not entitled to qualified immunity, and we reverse the district court's grant of summary judgment in their favor.

**III**

DeCesaro, representing himself, protests that he is in a different position than the other defendants because he did not work at Sterling, but rather at a central CDOC facility where he only reviewed grievances. He did not know of Howard's past encounters with the 2-11 Crew or the circumstances of Howard's transfer to Sterling, and lacked authority to remedy general threats to Howard's safety. The district court granted DeCesaro's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and we review such dismissals de novo, accepting all well-pleaded factual allegations in the complaint as true. MediaNews Group, Inc. v. McCarthey, 494 F.3d 1254, 1260-61 (10th Cir. 2007). Applying this standard to DeCesaro, we agree that he presents a distinction with a difference, as Howard has not sufficiently alleged subjective knowledge on DeCesaro's part.

Howard does not allege that DeCesaro had access to any information other than copies of his Step 1, Step 2, and Step 3 grievances, and prison officials' responses to the first two grievances. Although Howard referenced the reasons for his transfer from Fremont in the Step 1 grievance, his only specific statement about those circumstances is that 2-11 Crew members were "actively recruiting me for the purpose of financial assist[ance]." Unlike the Sterling defendants, DeCesaro was not privy to the meetings that occurred at Sterling where Howard explained the situation in more detail, and Howard does not present evidence that

- 32 -

DeCesaro had access to other background information. Nor does he claim that DeCesaro had any information regarding Howard's particular vulnerabilities—including details of his physique, sexual orientation, or the exact nature of his crimes. The grievances, standing alone, do not compel the conclusion that Howard's physical safety was in imminent danger. Because Howard does not allege that DeCesaro knew of an ongoing threat of assault, we agree that Howard has not stated a cognizable claim against DeCesaro.

In reaching this conclusion, we again reiterate that <u>Farmer</u> requires evidence of <u>actual knowledge</u> on the part of prison officials. 511 U.S. at 837. Howard met this standard with regard to Backer, Halligan, and Clarkson because he presented direct and circumstantial evidence of such knowledge adequate to create a genuine issue of material fact. Similar facts have not been pleaded with regard to DeCesaro, who undisputedly reviewed Howard's grievances in a bureaucratic vacuum far from the Sterling Correctional Facility.

Consequently, Howard has not met his burden of framing "a 'complaint with enough factual matter (taken as true) to suggest' that he . . . is entitled to relief." <u>Robbins v. Oklahoma ex rel. Dep't of Human Servs.</u>, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007)). We therefore affirm the district court's dismissal of Howard's claims against DeCesaro.

**IV**

Because the district court granted summary judgment to defendants after evaluating the merits of Howard's claims, it did not address PLRA's exhaustion requirement. On appeal, defendants Backer, Clarkson, and Halligan propose that even if the district court erred in granting summary judgment on the merits, they nonetheless prevail because Howard failed to exhaust his administrative remedies within the Colorado prison system.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Identifying the exact steps a prisoner must take to exhaust administrative remedies presents "a choice-of-law issue," derived from the requirements of "the prison grievance systems themselves." Kikumura v. Osagie, 461 F.3d 1269, 1282 (10th Cir. 2006) (quotations omitted); see also Jones v. Bock, 127 S. Ct. 910, 923 (2007) ("[I]t is the prison's requirements . . . that define the boundaries of proper exhaustion.").

PLRA exhaustion is an affirmative defense. See Jones, 127 S. Ct. at 921. We follow our usual practice with respect to affirmative defenses, and address only those arguments related to exhaustion that have been raised by defendants. See Freeman v. Watkins, 479 F.3d 1257, 1259-60 (10th Cir. 2007). In this appeal, the Sterling defendants emphasize a single argument as to why Howard's

claims are unexhausted:[9]  Howard never filed a separate grievance reporting the August 2005 sexual assaults and other subsequent threats that are the centerpiece of this litigation, and prison officials were therefore "precluded from investigating and  remedying" those assaults.

Howard followed the prison's grievance process beginning in May 2005 when he filed his Step 1 grievance and concluding when DeCesaro responded to his Step 3 grievance in February 2006.  These grievances warned prison officials that the 2-11 Crew presented a risk to Howard's personal safety so long as he remained in the East side of Sterling.  In response to his Step 3 grievance, Howard was told that he had received "the final administrative response in this matter and [he] ha[d] exhausted [his] administrative remedies."

Howard was not required to begin the grievance process anew when the very risk to his safety that he identified during the grievance process came to pass in August 2005.  At that time he was still residing in Sterling East, in the same

---

[9] Defendants also maintain that Howard abandoned his only exhausted "claim," a request for injunctive relief in the form of a housing transfer, in the district court.  They assert that his remaining "claim" for deliberate indifference is unexhausted because he did not request monetary damages during the grievance process.  But "one 'exhausts' processes, not forms of relief."  Booth v. Churner, 532 U.S. 731, 739 (2001).  Moreover, monetary damages are not available through the CDOC grievance process.  See Colo. Dep't of Corr. Reg. 850-04 § III(F) (providing that "damages for pain and suffering, and exemplary or punitive damages are not remedies available to offenders").  PLRA does not require a prisoner who otherwise complies with the grievance process to add a futile request for a remedy that is, by the prison's own terms, unavailable.

- 35 -

living division where he first filed his Step 1 grievance, and he was still awaiting the resolution of his Step 3 grievance. Howard's Step 1 grievance, filed while he lived in Unit 33, clearly indicated that he felt threatened anywhere in his living division, and thus the fact that he was later transferred to a different unit within the same division did not require him to file a new set of grievances. Howard had done all that the PLRA required with regard to the Sterling defendants' indifference to the threats present in the living division. Given the response to his first three grievances, further grievances complaining of the same living situation would have been redundant. See Johnson v. Johnson, 385 F.3d 503, 521 (5th Cir. 2004) ("As a practical matter, [plaintiff] could not have been expected to file a new grievance . . . each time he was assaulted . . . . Persuasive authority holds that, in such circumstances, prisoners need not continue to file grievances about the same issue."); see also Colo. Dep't of Corr. Reg. 850-04 § IV(B)(1)(f) ("Grievances which are duplicative or repetitive of the offender's prior grievances shall be denied."). Howard remained in the same situation between the time he filed the first grievance and the point at which he was transferred to Tennessee for reasons unrelated to his safety. Howard therefore exhausted his administrative remedies for deliberate indifference to the risk of assault before the transfer.

This is not the end of the story, however. Howard's complaint also alleges ongoing harassment from the 2-11 Crew after he returned to Sterling from

Tennessee in October 2005 and was housed in Units 1, 2, and 4 in Sterling West. Howard does not claim that he was sexually assaulted during this time, but his complaint does describe one physical assault and alleges that he suffered psychological stresses from the continuing threats. Howard's earlier grievances, which focused on risks to Howard's safety in Sterling East and his encounters with gang members there—and indeed, repeatedly requested a transfer back to Sterling West where he thought he would be safe—were not adequate to put prison officials on notice that he would be intimidated into participating in a scheme of financial fraud in Sterling West months later. See Colo. Dep't of Corr. Reg. 850-04 § III(D) (defining a grievance as a "written complaint . . . regarding a policy, condition, or . . . incident"). This aspect of Howard's complaint therefore fails to meet PLRA's exhaustion requirement.

When "a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad." Jones, 127 S. Ct. at 924. Howard may thus press on with his 42 U.S.C. § 1983 action only to the degree that it seeks recompense from the events that occurred at the Sterling Correctional Facility prior to his transfer to Tennessee on August 23, 2005.

## V

For the reasons explained, we **REVERSE** the district court's grant of summary judgment to Backer, Clarkson, and Halligan on Howard's exhausted claims, **AFFIRM** the district court's dismissal of Howard's claims against

- 37 -

DeCesaro, and **REMAND** for further proceedings consistent with this opinion.