**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 19, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TERRANCE D. WILSON,

     Plaintiff - Appellant,

v.

FRANCES FALK; SHERWYN PHILLIP;
STEVEN FRANK; JAMES FOX,

     Defendants - Appellees.

No. 16-1310

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-01459-CMA-MJW)**
_____

Brice A. Tondre, Lakewood, Colorado, for Plaintiff – Appellant.

Robert C. Staley, Office of the Attorney General (Cynthia H. Coffman, Attorney General, and Jennifer S. Huss, Assistant Attorney General, on the briefs), Denver, Colorado, for Defendants – Appellees.
_____

Before **MATHESON**, **McKAY**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

    Colorado state prisoner Terrance D. Wilson was stabbed eleven times by a fellow

inmate while incarcerated at the Limon Correctional Facility in Limon, Colorado. Having

survived the attack, Mr. Wilson brought this action under 42 U.S.C. § 1983 alleging that

Frances Falk, James Fox, Steven Frank, and Sherwyn Phillip—each an employee of the Colorado Department of Corrections ("CDOC")—violated his Eighth Amendment rights by failing to protect him from the assault. The district court granted summary judgment in favor of the defendants. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm as to defendant Falk, but reverse as to defendants Fox, Frank, and Phillip.

## I.    BACKGROUND

This case involves a dispute between the Crips and the Surenos, two rival gangs. Mr. Wilson, a former affiliate of the Crips, is currently serving a thirty-two-year prison sentence in connection with the 2011 homicide of Nathan Engle, a purported Surenos affiliate. While awaiting trial, Mr. Wilson was detained in the Larimer County Detention Facility ("Larimer") along with Christopher Green, whom Mr. Wilson recognized as a leader of the Surenos. Mr. Green allegedly told two people close to Mr. Wilson that the Surenos were making shanks in order to kill Mr. Wilson in apparent retaliation for Mr. Engle's death. And, indeed, Mr. Wilson reports that he was assaulted on three occasions while detained at Larimer—once on August 14, 2011, by Mr. Green and an unknown Sureno affiliate, and twice on October 21, 2011, first by an inmate named Charles Cousino, purportedly at Mr. Green's request, and later the same day by an inmate named Feliciano Carillo, whom Mr. Wilson describes as "a Sureno shot caller." Aplt. App'x 135–36. Mr. Wilson filed grievances with respect to each assault.

Mr. Wilson was convicted in January 2012, and the following month he was transferred from Larimer to the Denver Reception and Diagnostic Center ("DRDC"), where he asserts that he was yet again attacked by a Sureno. During his time at DRDC,

2

Mr. Wilson states that he completed intake forms in which he listed his enemies and documented his "psychological fear of Mexican gang members." *Id.* at 136. On April 9, 2012, Mr. Wilson was transferred from DRDC to the Limon Correctional Facility ("Limon"), where he would continue serving his thirty-two-year sentence. Within a day of arriving at Limon, Mr. Wilson participated in orientation, an event that he used as an opportunity to disclose his concern about the Surenos in general and Mr. Green, Mr. Carillo, and Mr. Cousino in particular. Mr. Wilson alleges that shortly after the orientation he spoke with defendant Falk, who he understood to be the warden at Limon, about his concerns with the Surenos and the previous attacks. Although Ms. Falk does not recall ever meeting or talking to him, Mr. Wilson says that she advised him to talk to a lieutenant and case manager about the Surenos.

Mr. Wilson was preliminarily assigned to Unit 1, the prison's transition unit designated for inmates transferring in or out of Limon or who otherwise require temporary placement. About one week after arriving at Unit 1, Mr. Wilson was reassigned to Unit 3. There are six living units at Limon; each living unit has three pods separated by walls, and each pod in turn has three tiers. Inmates are generally not permitted to leave the pod to which they are assigned. In general, prison officials at Limon do not attempt to separate gangs from each other. Instead, housing assignments attempt to balance the number of gang members assigned to each living unit. Once in Unit 3, Mr. Wilson claims that he "came face to face with" his old nemesis Mr. Green, who seemingly followed a similar path from Larimer to Limon and was now "the Sureno shot caller" at the Limon facility. *Id.* Mr. Wilson says that he advised defendants

3

Lieutenant Fox and Sergeant Frank "of the issues between me and Green," and that Mr. Green was thereafter placed on the second level of the same pod.[1] *Id.*

On April 17 and April 19, Mr. Wilson claims to have met with defendant Phillip, his case manager. On both occasions Mr. Wilson states that he informed Mr. Phillip of "the Sureno issue" and "requested transfer to another facility." *Id.* But after those two meetings Mr. Phillip allegedly "refused to discuss the issue of protection . . . from the Surenos." *Id.* Mr. Wilson complained about Mr. Phillip's alleged recalcitrance to Commanding Officer Joshua Chase, who advised Mr. Wilson to file "kites," shorthand for prison forms printed on yellow paper by which a prisoner can make written requests to meet with a prison official.[2] *Id.* at 79, 136, 144. Mr. Wilson thereafter submitted at least ten kites, which he either gave to Mr. Chase or placed in the "kite box." *Id.* at 136. Sometimes Mr. Wilson asked friends to place his written kites in the kite box for him.

On June 9, 2012, Mr. Wilson was allegedly attacked by a fellow inmate named Manuel Diaz and another unknown person. Mr. Diaz allegedly followed Mr. Wilson into his cell and stabbed him with a long rusty nail, inflicting deep cuts along Mr. Wilson's

---

[1] Mr. Wilson is likely mistaken about when and where he again encountered Mr. Green. According to Limon's records, Mr. Green was at all relevant times housed in Unit 1, not Unit 3.

[2] According to Mr. Wilson's deposition testimony, "[a] kite is a system that's completely flawed. A kite is something that you turn in that will or will not be responded to. Most of the time not." Aplt. App'x 79. Mr. Wilson testified that he submitted two or three kites per week. Not all were for purposes of reporting threats or requesting protection, however. For instance, Mr. Wilson "put in a kite every week" for the purpose of requesting a haircut. *Id.*

4

chest, stomach, arms, and head. Mr. Wilson claims that he was able to subdue Mr. Diaz, at which point "a group of Surenos" rushed into his cell, carried Mr. Diaz away, and warned that they would "finish killing" Mr. Wilson if he reported the attack. *Id.* at 137. Mr. Wilson thereafter continued to discreetly put kites in the kite box and repeatedly asked Mr. Chase to talk to Mr. Phillip. He also asked his friends to talk to prison officials.

On June 21, 2012, Mr. Wilson claims that Mr. Green, backed by at least fifteen members of the Sureno and Pica gangs, attempted to throw him over a second floor railing, purportedly because they had heard he was talking to the authorities about Sureno threats and attacks. Other prison inmates are said to have intervened to prevent Mr. Wilson from going over the railing. Later that night, however, two Surenos allegedly attacked Mr. Wilson in his cell, with additional one-on-one Sureno attacks following on June 22 and 23. Mr. Wilson states that he wrote kites documenting all of these attacks and that his friends put them in the kite box on his behalf. [3]

At some unspecified point in time, Mr. Wilson allegedly asked Mr. Phillip, his case manager, not to let him be placed in Unit 3. Mr. Wilson also asked Mr. Frank and Mr. Fox not to let him be assigned to Units 2, 3, or 4, all of which housed a large number of Surenos. One of Mr. Wilson's fellow inmates, Edward Drake, heard Mr. Wilson make

---

[3] Defendants cast some doubt on whether any of these incidents—and especially the June 21 railing incident—actually happened. Ms. Falk testified that she has no recollection of the June 21 event and that if it had occurred as described by Mr. Wilson there would have been a facility lockdown. Meanwhile CDOC records show that Mr. Green, the supposed ringleader of the June 21 incident, was transferred out of Limon on June 4, 2012. On the date of the incident, Mr. Green was housed in segregation at the Fremont Correctional Facility.

this latter request. Nevertheless, Mr. Wilson was assigned to Unit 3 despite the purported availability of beds in Units 1 and 5. Another fellow inmate, Nathan Nulle, allegedly turned in "a stack of kites" to prison officials, including Mr. Phillip, because he was told of a "real threat to Mr. Wilson's life." *Id.* at 137, 139.

On July 2, 2012, Mr. Wilson was talking to his daughter on the telephone, at which point Mr. Diaz allegedly stabbed him eleven times, inflicting injuries to Mr. Wilson's heart, lungs, head, and neck. Mr. Wilson thereafter brought this action under 42 U.S.C. § 1983 against defendants Falk, Fox, Frank, and Phillip.[4]

## II.  DISCUSSION

Under the doctrine of qualified immunity, government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Our review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment decisions." *Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016) (citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear

---

[4] Mr. Wilson's second amended complaint also names Mr. Chase and Tom Norris, Mr. Wilson's case manager at DRDC, as defendants. Mr. Wilson has not appealed their dismissals from this case.

the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (citation omitted).

"When determining whether qualified immunity applies, we may choose which of the two prongs of the qualified immunity analysis should be addressed first." *The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (internal quotation marks omitted). At oral argument, counsel for Defendants conceded that if this court were to find an Eighth Amendment violation on these facts, it would be a violation of clearly established law. *See Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008) (recognizing that prison inmates have a clearly established Eighth Amendment right to be protected from substantial risks of assault). We appreciate and accept Defendants' concession and will accordingly discuss the first prong of the qualified immunity analysis only.

The Eighth Amendment provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (internal quotation marks omitted). In order for a plaintiff to show that a defendant prison official was deliberately indifferent, the plaintiff must show both "that the official was subjectively aware of the risk," *id.*, and that the official "recklessly disregard[ed] that risk," *id.* at 836. To be sure,

7

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.

*Id.* at 837 (emphasis added). The Supreme Court's requirement that a prison official have actual knowledge accords with the text of the Eighth Amendment, which prohibits cruel and unusual "punishments," rather than cruel and unusual "conditions." *Id.* Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

We now turn to each of the defendants to determine whether Mr. Wilson has met his burden of showing that through their knowledge and conduct a jury could find that they violated Mr. Wilson's Eighth Amendment rights.

### A. Associate Warden Falk

Mr. Wilson asserts that he interacted with Ms. Falk exactly once—during or just after his orientation to Limon. In particular, Mr. Wilson stated in his deposition that:

When I learned [Ms. Falk] was the warden, I specifically talked to her. That's why I remember her specifically. That's the only time I ever seen her, ever met her, ever known anything to do with her. But I went up to her after the meeting and I showed her my paper, let her know about the Surenos problems, and she told—I remember what she looked like and everything. . . .

. . .

8

> She said basically to talk to my lieutenant wherever I go; my case manager, inform them, let them know. That's what she said—she gave me some good advice but that's all she did.

Aplt. App'x 80, 86. Ms. Falk, for her part, states that she was an associate warden at the time Mr. Wilson arrived at Limon and did not become warden at that facility until August 2012. She also testified that she does not recall ever meeting Mr. Wilson and that she was not present at any orientation sessions for new arrivals.

In any event, viewing the evidence in the light most favorable to Mr. Wilson and assuming this meeting did in fact occur, Mr. Wilson cannot show that Ms. Falk acted with deliberate indifference to a substantial risk of serious harm. Mr. Wilson concedes that he had just a single encounter with Ms. Falk and that she gave him "good advice," which Mr. Wilson in fact followed. *Id.* at 87. Thus, on Mr. Wilson's own account of what Ms. Falk knew and the actions she took, Ms. Falk responded reasonably to the risk that the Surenos posed to his wellbeing. Indeed, Mr. Wilson has never argued that Ms. Falk's response was unreasonable. The district court, therefore, correctly held that Ms. Falk was entitled to qualified immunity and summary judgment on Mr. Wilson's § 1983 claim. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

## B. Lieutenant Fox & Sergeant Frank

Upon arriving at Limon, Mr. Wilson was initially assigned to Unit 1, where he lived for less than a week before moving on to Unit 3. Mr. Fox was the Intake Lieutenant and supervisor of Units 1, 5, and 6. Mr. Frank worked in Unit 1, under Mr. Fox's

9

supervision. Both men stated in sworn affidavits that they have no recollection of Mr. Wilson or any of the allegations made in the Second Amended Complaint. Mr. Wilson, meanwhile, testified that he spoke with Mr. Fox and Mr. Frank "immediately after" Ms. Falk advised him to speak with a lieutenant:

> . . . I remember specifically talking to a Fox, Mr. Fox, CO Fox, but I just don't recall what he looks like. I only met him one time. I was in Unit 1 for about a day. So the time I talked to him was immediately after meeting with the warden. That's when I talked to Fox and that's when I talked to Frank. That's the only time I ever talked.
>
> That's when they moved Chris Green somewhere else. I told them the whole problem. The Surenos were after me. Chris Green had already went to them. He told them this same story, that I was trying—that I was a threat to them, they was trying to kill me in county. I don't know what he said, but they cuffed him up and moved him upstairs. That's the only time I ever talked—even seen these people.

Aplt. App'x 84–85.Mr. Wilson's deposition testimony is partly corroborated by a declaration from fellow inmate Edward Drake. Mr. Drake says that in June 2012 he was housed in Unit 1, "where all the new arrivals come in." *Id.* at 140. One day after he first met Mr. Wilson, Mr. Drake asserts that he saw Mr. Wilson talking to Mr. Fox and Mr. Frank:

> The next day I was coming back from lunch and notice [sic] Inmate Wilson talking to Sgt. Frank and Lt. Fox in the hall-way explaining his situation. I heard him tell them that some guys was making threats towards his life and said that they home-boys was going to get him. He asked them not to move him to Unit 2–3 or 4. The next day he was moved to Unit 3 where a lot of those guys are at.

*Id.* at 140–41.The district court found that, even assuming the conversation took place as alleged, Mr. Wilson's "vague and non-specific reference to 'some guys . . . making threats towards his life' is insufficient to support a finding that Defendants Frank

10

and Fox were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that Defendants Frank and Fox did, in fact, draw that conclusion." *Id.* at 196. We disagree. At his deposition, Mr. Wilson testified he told Mr. Fox and Mr. Frank "the whole problem," i.e. that "the Surenos were after" him. His story is corroborated by Mr. Drake, who says he heard Mr. Wilson tell Mr. Fox and Mr. Frank he had received death threats and "that they home-boys," meaning the Surenos, "was going to get him." Viewing that evidence in the light most favorable to Mr. Wilson, a reasonable jury could find that Mr. Fox and Mr. Frank were subjectively aware of a substantial risk of serious harm to Mr. Wilson.

On appeal, the Colorado Attorney General hints at an alternative basis for affirming, arguing that Mr. Fox and Mr. Frank took proactive steps to separate Mr. Wilson and Mr. Green, and thus they were not deliberately indifferent to his plight. Perhaps it is possible Mr. Fox and Mr. Frank acted reasonably, but the district court reached no conclusion on that score, and we decline to affirm on an alternative ground neither passed on below nor cultivated on appeal. *See, e.g.*, *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (declining to address an alternative basis for affirming the district court's dismissal where appellees did not adequately develop an argument). Instead, we express no opinion on this issue and leave it for the district court's consideration on remand.

## C. Case Manager Phillip

The evidence regarding Mr. Phillip's knowledge and inaction is more substantial. Mr. Phillip was Mr. Wilson's case manager at Limon from approximately April 17, 2012

to July 17, 2012. As a case manager, Mr. Phillip managed a caseload of approximately 90 to 100 offenders; he was responsible for assisting with parole plans, community referrals, job assignments, and treatment programs. Mr. Wilson asserts that he met with Mr. Phillip on April 17, 2012 and again on April 19, 2012, eight and ten days after he arrived at Limon. According to Mr. Wilson's sworn affidavit, on both occasions he informed Mr. Phillip "of the Sureno issue" and requested a transfer to another facility. Aplt. App'x at 136. After those two meetings, Mr. Wilson states that Mr. Phillip "refused to discuss the issue of protection of me from the Surenos." *Id.* In response, Mr. Wilson complained to another prison official, Mr. Chase, who advised Mr. Wilson to file kites, which Mr. Wilson says he did over and again in the ensuing weeks. Another inmate, Nathan Nulle, submitted a declaration stating that he too "turned in a stack of kites to . . . Case Manager Phillips [sic] informing them of the events occurring with Mr. Wilson." *Id.* at 139. Mr. Nulle said it was "immediately clear" upon Mr. Wilson's arrival at Limon that there was tension with the Sureno gang members. *Id.* Mr. Nulle further asserts that he witnessed gang intimidation tactics and was told "that there was a real threat to Mr. Wilson's life." *Id.*

In his own sworn affidavit, Mr. Phillip asserts that he has "no recollection of Wilson ever speaking to me verbally or submitting a kite or grievance to inform me that he had any custody issues at [Limon] or any other CDOC facility, had a bounty on his head from the Surenos gang, or had been threatened or assaulted by other inmates while he was housed at [Limon]." *Id.* at 96. Had Mr. Wilson approached him with any of that information or submitted a kite or grievance regarding the same, Mr. Phillip says that he

12

would have documented it in Mr. Wilson's chronlog report. Mr. Wilson's chronlog report bears no indication that Mr. Wilson or Mr. Nulle ever notified Mr. Phillip of the threat posed by the Surenos. The chronlog confirms that Mr. Wilson and Mr. Phillip met on April 17 and discussed matters unrelated to the Surenos or any risks to Mr. Wilson's health and safety. The chronlog bears no indication of an April 19 meeting, as Mr. Wilson alleges, but it does show that Mr. Wilson and Mr. Phillip met on at least five other occasions, each time for purposes other than discussing the Surenos or Mr. Wilson's protection. In his deposition testimony, Mr. Phillip acknowledged that he generally does not keep kites or list them in an inmate's chronlog. He could not definitively say whether he received any kites at all from Mr. Wilson, and he did not remember Mr. Nulle.

The district court concluded that Mr. Phillip is entitled to qualified immunity because the evidence, viewed in the light most favorable to Mr. Wilson, does not support a finding that Mr. Phillip knew that a substantial risk of serious harm existed and that Mr. Phillip did, in fact, draw that conclusion. We respectfully disagree. Mr. Wilson and Mr. Nulle have both declared that they submitted multiple kites to Mr. Phillip informing him of at least some of the events precipitating Mr. Wilson's stabbing. Mr. Wilson specifically claims that he twice told Mr. Phillip about the Surenos and twice requested a transfer to another facility. After his second request, Mr. Phillip allegedly "refused to discuss the issue of protection" any further. *Id.* at 136. In the following weeks, Mr. Wilson alleges that he was attacked by Surenos affiliates on five separate occasions—on June 9, by Mr. Diaz, with a long rusty nail, on June 21, by Mr. Green with at least fifteen

13

Picas and Surenos in tow, again on June 21, by two Surenos in Mr. Wilson's cell, and finally on June 22 and 23, each time by a single Sureno. Mr. Wilson claims that "[k]ites regarding all the foregoing attacks were written by me and put in the kite box by friends of mine" and that Mr. Phillip was "told of all these attacks by me." *Id.* at 137. Mr. Wilson further claims that "[i]n the kites I stated that the person who attacked me on June 9, had knives." *Id.* Mr. Wilson also claims that he asked Mr. Phillip "not to let me be placed in Unit 3," and that he was assigned there despite the availability of beds in Units 1 and 5. *Id.*

The foregoing evidence, if believed, would suffice to show that Mr. Phillip violated Mr. Wilson's Eighth Amendment right to be free from cruel and unusual punishment. *See Lawmaster v. Ward*, 125 F.3d 1341, 1351 (10th Cir. 1997) ("While qualified immunity was meant to protect officials performing discretionary duties, it should not present an insurmountable obstacle to plaintiffs seeking to vindicate their constitutional rights."). And viewing that evidence in the light most favorable to Mr. Wilson, as we must, we find there exists a genuine dispute of material fact as to whether Mr. Phillip was subjectively aware of the risk to Mr. Wilson's health and safety and whether he recklessly disregarded that risk. *See Farmer*, 511 U.S. at 837. Finally, we also note that, unlike Mr. Phillip's co-defendants discussed *supra*, were we to assume that Mr. Phillip was aware of the risk, there is no evidence in the record through which we could conclude that Mr. Phillip did anything at all to reasonably abate the risk of which he was informed. On this record, we disagree with the district court's conclusion that Mr. Phillip is entitled to qualified immunity. Because genuine issues of material fact exist as to

14

whether Mr. Phillip was subjectively aware of and disregarded a substantial risk to Mr. Wilson's health and safety, summary judgment was improper.

### III. CONCLUSION

For the above reasons, we AFFIRM the grant of summary judgment in favor of defendant Falk, and REVERSE the grant of summary judgment in favor of defendants Fox, Frank, and Phillip. We therefore REMAND for further proceedings consistent with this decision.