**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DELMART E.J.M. VREELAND, II,

    Plaintiff - Appellant,

v.

CELIA SCHWARTZ, Legal Assistant II,
Colorado Department of Corrections,
Buena Vista Correctional Facility;
LIEUTENANT S. MORGAN,
BVCP/North Unit Colorado Department of
Corrections, Buena Vista Correctional
Facility; SERGEANT G. WOOD,
BVCF/North Unit Colorado Department of
Corrections, Buena Vista Correctional
Facility; CASE MANAGER JEFF
HANSEN, BVCP/North Unit Colorado
Department of Corrections, Buena Vista
Correctional Facility; DAVID COTTEN,
Administrative Service Manager, Colorado
Department of Corrections, Buena Vista
Correctional Facility; WILLIAM
BRUNELL, Associate Warden, Colorado
Department of Corrections, Buena Vista
Correctional Facility; JOHN DAVIS,
Warden, Colorado Department of
Corrections, Buena Vista Correctional
Facility,

    Defendants - Appellees.

No. 19-1316
(D.C. No. 1:13-CV-03515-PAB-KMT)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

    [*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore

Before **HARTZ**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

Delmart E.J.M. Vreeland, II, a Colorado prisoner proceeding *pro se*, sued

several employees of the Colorado Department of Corrections (CDOC) under

42 U.S.C. § 1983, alleging violations of various constitutional rights. He now

appeals from district court orders dismissing some of his claims and granting

summary judgment against the rest. Exercising jurisdiction under 28 U.S.C. § 1291,

we affirm.

Vreeland also attempts to appeal from the court's taxation of costs. We

dismiss that portion of the appeal because Vreeland waived the issue.

I.     **BACKGROUND & PROCEDURAL HISTORY**

For most of the timeframe relevant to this lawsuit, Vreeland resided at

CDOC's Buena Vista Correctional Facility. His original complaint alleged that

certain Buena Vista employees intentionally interfered with his right of access to the

courts, and retaliated against him for exercising his First Amendment right to file

grievances and other lawsuits. The district court screened his complaint and

dismissed it as legally frivolous. Vreeland appealed and we affirmed as to the

---

ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

right-of-access claims but reversed as to the First Amendment retaliation claims. *See Vreeland v. Schwartz*, 613 F. App'x 679, 686 (10th Cir. 2015).

On remand, Vreeland filed an amended complaint, again claiming various instances of retaliation for exercising his right to file grievances, or lawsuits, or both. We describe the factual basis for each claim as it becomes relevant to our analysis, below. We note, however, that some of these claims arguably went beyond First Amendment retaliation (*i.e.*, asserting violations of other constitutional rights), and the district court *sua sponte* refused to consider them to that extent, deeming them disallowed by this court's mandate. Upon motion from defendants, the district court also dismissed one claim as time-barred.

The remaining claims proceeded to discovery and summary judgment. The district court referred the summary judgment motion to a magistrate judge, who recommended granting the motion in full. Vreeland timely objected. Ultimately, the district court granted summary judgment to defendants, finding that Vreeland failed to show a genuine dispute of material fact as to one of his claims, and that he failed to exhaust his administrative remedies as to the rest. The court accordingly entered final judgment against Vreeland, and Vreeland timely filed a notice of appeal.

A few weeks later, the district court taxed costs against Vreeland. He then filed a "corrected" notice of appeal, embracing both the judgment on the merits and the costs award.

## II.    ANALYSIS

Vreeland's amended complaint on remand asserted four claims for relief, although he labeled them 1, 3, 4, and 5 (skipping 2).  We will address them in turn. We review all relevant issues de novo, namely, a statute-of-limitations dismissal at the pleading phase, *see Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1323 (10th Cir. 2008), a finding of failure to exhaust prison administrative remedies, *see Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002), and a grant of summary judgment based on the nonmovant's lack of evidence, *see Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 766, 772 (10th Cir. 2013).

### A.    Claim 1

Vreeland's claim 1 alleges that Buena Vista legal assistant Celia Schwartz was upset with grievances and lawsuits filed by Vreeland, and so interfered with his legal mail in August 2010.  The district court dismissed this claim as time-barred under the two-year statute of limitations applicable to § 1983 claims in Colorado.

The district court's analysis reaches back to a separate lawsuit Vreeland filed in July 2012 against "Sergeant Griggs," another Buena Vista employee who allegedly interfered with his legal mail.  In March 2013, Vreeland moved to amend that complaint to add Schwartz as a defendant with respect to the August 2010 mail seizure (the same seizure at issue in claim 1 of this lawsuit).  The district court denied amendment, finding that the statute of limitations expired in August 2012, and that Vreeland's July 2012 original complaint did not relate back because it was clear that Vreeland knew of Schwartz's involvement from the outset.

4

In this lawsuit, Vreeland attempts to circumvent that ruling by arguing that Schwartz, in opposing amendment in the 2012 lawsuit, claimed that only Sergeant Griggs had handled the legal mail in question. Then, after defeating amendment, she submitted a declaration in support of Griggs's summary judgment motion stating that only she, not Sergeant Griggs, had handled that mail. Vreeland accordingly asserts that the facts he needed to timely plead claim 1 were fraudulently concealed from him.

Like the district court, we find this argument meritless. Vreeland's proposed amended complaint in the 2012 lawsuit alleges that, in August 2010, "Defendant Griggs, over the objection of plaintiff, allowed another party to open the legal mail and then defendant Schwartz, over the objection of plaintiff, began to read the legal material page by page . . . ." *Vreeland v. Griggs*, No. 12-cv-1921-PAB-KMT (D. Colo.), ECF No. 55-1 at 4 (filed Mar. 25, 2013). Further, "Defendant Schwartz began to comment on [the materials she was reading] and even asked several questions of plaintiff . . . that plaintiff refused to answer." *Id.* Thus, even if Schwartz changed her position over the course of the 2012 lawsuit (about which we express no opinion), Vreeland's allegations show that Schwartz committed her alleged wrongs in his presence in August 2010. He had two years to sue her, but did not. The district court correctly rejected Vreeland's fraudulent concealment argument and correctly dismissed claim 1 as time-barred.

5

**B.      Claim 3**

Vreeland's claim 3 alleges that Schwartz, in summer 2013, would not allow Vreeland to obtain thousands of jailhouse phone call recordings (purportedly relevant to his state post-conviction proceedings, which were then ongoing) without giving her permission to listen to them first, and that she did so to punish him for his many grievances and lawsuits.  At summary judgment, defendants claimed that Vreeland failed to exhaust his administrative remedies as to this claim, because his grievances did not alert defendants that he was complaining about retaliation.

Vreeland resisted defendants' failure-to-exhaust defense with two arguments. First, he said, CDOC's grievance regulations do not require him to specifically point out the retaliatory nature of the conduct of which he complained.  Alternatively, if the regulations do require such specificity, his case manager "specifically instructed [him] not to file a grievance accusing Schwartz of retaliation, and instead to take the high road and simply [state on the grievance form] what it was that [he] required and ask how to obtain it."  R. vol. 7 at 32.  Vreeland accordingly argued that exhaustion had been made "unavailable" to him.  *See Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) ("Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust.").

The district court focused solely on Vreeland's unavailability argument.  The court found that Vreeland had not submitted evidence that would create a genuine

6

issue of material fact on the elements of a claim that a prison officer had rendered the grievance process unavailable. Therefore, he failed to exhaust.

### 1. Level of Specificity Required

If CDOC regulations do not require the level of specificity for which defendants argue, then Vreeland need not rely on his unavailability argument (and the district court's unavailability ruling was superfluous). So we first examine whether CDOC grievance regulations require inmates to make clear that they are complaining about retaliation when that is the legal theory they might ultimately assert in court.

Each prison system may decide for itself the amount of detail a prisoner must include in a grievance to properly exhaust a claim. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). CDOC has done so through its formal regulation governing prisoner grievances, known as AR 850-04. The version of AR 850-04 in force in 2013, when Vreeland grieved Schwartz's refusal to give him access to the jailhouse phone call recordings, established that "[t]he grievance shall clearly state the basis for the grievance and the relief requested." R. vol. 7 at 546 (§ IV.D.9.b).[1]

Defendants do not argue that this language requires the inmate to identify specific legal theories or use specific words. They instead focus on what is required to "clearly state the basis for" a retaliation-based grievance. The problem, according to defendants, is that our case law says an action taken in retaliation for exercising a

---

[1] Vreeland argues at length that the district court erroneously allowed defendants to rely on a post-2013 version of AR 850-04 in summary judgment proceedings. Our disposition relies entirely on the version in force in 2013, so this argument is moot.

constitutional right may lead to liability "even where [that] action . . . would be otherwise permissible." *Smith v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990). Thus, whether using the word "retaliation" or not, an inmate must alert prison authorities to the retaliatory nature of the grievance, so they know to investigate the motive for the adverse action, and not just whether, *e.g.*, the adverse action conforms with prison regulations.[2]

We find defendants' argument persuasive under these circumstances, so we need not decide whether we agree with it as a general matter. We have reviewed Vreeland's grievance forms and they provide no hint that Schwartz was motivated to withhold the jailhouse recordings as punishment for filing grievances and lawsuits. Rather, Vreeland explains why he needs the recordings as part of his post-conviction proceedings, and then argues that the prison regulation Schwartz was invoking to withhold the recordings could not be constitutionally applied to him under the circumstances. CDOC, in response, likewise focused on the regulation in question.

Vreeland's grievances directed CDOC to focus on an issue (the propriety of the regulation) that may only be secondary in a retaliation context. Vreeland accordingly did not give proper notice of the nature of the wrong he now asserts as

---

[2] Defendants give as an example a letter Vreeland wrote to Buena Vista's associate warden regarding the events that became claim 4 (described below). Vreeland stated in that letter that two prison employees arranged to have Vreeland fired from a job "because . . . I [Vreeland] filed a grievance against [one of them] and . . . sued Griggs [in the 2012 lawsuit]." R. vol. 6 at 462. This, according to defendants, is enough to "describe[] retaliation without using the word itself." Aplee. Answer Br. at 43.

8

the basis for his claim 3. *Cf. Jones*, 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system *and claim to claim* . . . ." (emphasis added)).

## 2.   Unavailability

We now turn to Vreeland's claim that his case manager instructed him not to accuse Schwartz of retaliation. An inmate claiming that prison officials rendered the grievance process effectively unavailable

> must produce specific facts that show there is a genuine issue of fact as to whether (1) the threat, machination, or intimidation actually did deter him from lodging a grievance and (2) the threat, machination, or intimidation would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance.

*May v. Segovia*, 929 F.3d 1223, 1235 (10th Cir. 2019) (brackets and internal quotation marks omitted). In the district court's view, Vreeland failed to present evidence raising a genuine issue of material fact as to either element.

We agree with the district court's disposition, though for a slightly different reason. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal."). Our review of the record shows that Vreeland failed to produce evidence of any threat, machination, or intimidation—a predicate for both elements of his unavailability argument. Below, Vreeland said that his case manager wanted him to "take the high road," R. vol. 7 at 32, so the case manager "informed" or "advised" or "instructed" or

9

"told" Vreeland not to accuse Schwartz of retaliation, *id.* at 30–33; R. vol. 8 at 96. *See also* R. vol. 7 at 32 ("[F]ailure to use the word retaliation would be due to the advi[c]e of the case manager[.]"); *id.* at 33 ("[F]ailure to use the word retaliation[] [was] based upon advi[c]e of the CDOC case manager[.]"). Vreeland points to nothing suggesting that he faced any consequence for ignoring this advice.

For the first time on appeal, Vreeland asserts (without citation to the record) that his case manager "said no grievance based on retaliation would be allowed, that was the end of it." Aplt. Opening Br. at 36. He further claims that, had he tried to submit a retaliation grievance anyway, he "would have been issued [a] code of penal discipline report for disobeying an order/direction, and been punished and placed in segregation." *Id.* None of this was before the district court.[3]

"Absent special circumstances, we will not reverse on a ground not raised below." *Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772, 782 (10th Cir. 2007). We see no special circumstances here, and we therefore affirm the district court's grant of summary judgment on claim 3.[4]

_____

[3] The latter claim is also implicitly contradicted by the facts of claim 4, in which he asserts—with no mention of negative consequences—that he used subterfuge to circumvent his case manager's refusal to allow him to file a grievance. *See infra*.

[4] Relying on *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008), Vreeland says that "exhaustion requirements are satisfied for new claims arising from [the] subject of [the] initial grievance and those claims remain valid even if other claims are dismissed." Aplt. Opening Br. at 39. Vreeland severely stretches *Howard*. In that case, the inmate grieved what he believed to be an imminent threat of assault, and the threat was unfortunately carried out while the grievance process was ongoing. *Id.* at 1244. In response to the state's argument that the inmate had not grieved the assault

10

## C.     Claim 4

For much of his time at Buena Vista, Vreeland worked as a laundry clerk in his unit. In August 2013, he changed jobs to "unit clerk." R. vol. 6 at 334, ¶¶ 20–21; *see also* R. vol. 7 at 61, ¶ 84. Vreeland does not say what a unit clerk does or what advantages it has over being a laundry clerk, if any. Regardless, Vreeland's claim 4 alleges that Lieutenant S. Morgan and Sergeant G. Wood arranged to have Vreeland fired from his unit clerk job in August 2013; that Case Manager J. Hansen prevented him from grieving Morgan's and Wood's actions; and that all three were motivated by a desire to punish Vreeland for his many grievances and lawsuits.

Specifically as to his claim that he could not grieve the matter, Vreeland says he complained to Hansen about the firing and asked for a grievance form. Hansen told Vreeland it was not grievable. Soon after, Vreeland asked Hansen for a grievance form so he could make a complaint against the mailroom. Hansen issued the form. Vreeland used the form to grieve his termination from the unit clerk position (saying nothing about the mailroom), and then submitted the form to Hansen. "Hansen sent it back to [Vreeland] with the words denied and not grievable on it." R. vol. 7 at 64, ¶ 100.

At summary judgment, defendants argued that Vreeland failed to exhaust. Vreeland responded that Hansen thwarted his attempt to exhaust his administrative

---

itself, we said that he "was not required to begin the grievance process anew when the very risk to his safety that he identified during the grievance process came to pass." *Id*. In Vreeland's case, by contrast, his alleged injury had already been realized when he filed his deficient grievance.

remedies, making them "unavailable." The district court rejected the unavailability argument because the only evidence of Hansen's actions was Vreeland's own declaration, which the district court deemed to be "uncorroborated, self-serving, and conclusory," and so incapable of "establish[ing] a genuine issue of material fact." R. vol. 8 at 125. Thus, the district court found a failure to exhaust.

On appeal, Vreeland argues that other evidence supported his declaration, *i.e.*, it was not uncorroborated. The only evidence he cites shows that he complained via registered mail to the associate warden about the allegedly retaliatory firing, not about Hansen's alleged refusal to allow him to grieve the matter.[5] Thus, the only evidence before the district court supporting Vreeland's unavailability argument was Vreeland's own story, as conveyed in his declaration.[6]

We disagree with the district court's use of the word "conclusory" to describe this part of Vreeland's declaration. Vreeland's account does not "[e]xpress[] a factual inference without stating the underlying facts on which the inference is based." *Conclusory*, Black's Law Dictionary (11th ed. 2019). Vreeland states with particularity what he claims to be the underlying facts.

---

[5] This is the same letter described in n.2, *supra*. Vreeland makes no argument that this letter may be deemed a substitute for CDOC's formal grievance process.

[6] In the district court, Vreeland said he had also attached the returned grievance form—the form on which Hansen had supposedly written "denied and not grievable"—as Exhibit S to his summary judgment response. *See* R. vol. 7 at 64. The district court could not find Exhibit S in the summary judgment record (it is likewise not in the record on appeal). Vreeland tells us that a scanning mistake in the district court clerk's office may have been to blame, but he does not argue that this hypothetical mistake amounts to some sort of reversible error.

We also cannot reject Vreeland's declaration as "self-serving." "So long as an affidavit is based upon personal knowledge and sets forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature." *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012) (brackets, citation, and internal quotation marks omitted).

We are therefore left with the district court's ruling that Vreeland's declaration is uncorroborated. While true, we cannot agree that this alone entitles defendants to summary judgment. Defendants point us to no objective evidence, such as a video recording, blatantly contradicting Vreeland's story. *Cf. Scott v. Harris*, 550 U.S. 372, 378–81 (2007). Nor does Vreeland speculate about events he never witnessed, *see* Fed. R. Evid. 602 (requiring non-expert witnesses to testify from personal knowledge), or offer a story that is "unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature," *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991) (brackets and internal quotation marks omitted). Nor does his story contradict a previous sworn statement. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002) (discussing the sham affidavit doctrine).

The district court held, in essence, that no reasonable jury could believe Vreeland's story. "On summary judgment, a district court may not weigh the credibility of the witnesses." *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). We therefore cannot affirm summary judgment against Vreeland on claim 4 on the grounds given by the district court. But again, we may affirm on any basis the

13

record supports. *Richison*, 634 F.3d at 1130.

To succeed on a First Amendment retaliation claim, Vreeland must prove, among other things, that he suffered an "adverse action," meaning "an injury that would chill a person of ordinary firmness from continuing to engage in [constitutionally protected] activity." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). In this district court, defendants argued that Vreeland suffered no adverse action because they did not fire him from his unit clerk job. From defendants' perspective, Vreeland was always a "Unit Worker." R. vol. 6 at 334, ¶¶ 20, 23. First, he "served as a laundry clerk as a unit worker." *Id.* ¶ 20. Next, he was "re-assigned to be a unit clerk within the job of unit worker." *Id.* ¶ 21. Finally, he was "re-assigned" to a different (unspecified) role, but still "retained his position as a unit worker." *Id.* ¶¶ 22–23; *see also id.* at 342 ("Plaintiff suffered no adverse action, as he remained a unit worker before and after the reassignment and was not fired from a job.").

Vreeland responded that this was a "game of semantics," R. vol. 7 at 42, but did not deny that he quickly received new duties after being reassigned from his unit clerk position. Accepting defendants' terminology for purposes of argument, he instead asserted that "be[ing] reassigned to a lesser job like laundry clerk without just cause" still constitutes retaliation. *Id.*

We cannot tell whether Vreeland meant to say that defendants sent him back to the laundry clerk position, or whether Vreeland was simply using laundry clerk as an example of something he considers "lesser." More generally, we have thoroughly

14

examined the record and we can find nothing explaining why the new job was "lesser" than the unit clerk position. Thus, viewing the facts in the light most favorable to Vreeland, he was

- hired as a unit clerk, a position he does not otherwise describe;

- fired from that position on account of protected First Amendment activity; and

- quickly re-hired to a position he does not name or describe.

"[O]ur standard for evaluating th[e] chilling effect on speech is objective, rather than subjective." *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). We hold that Vreeland did not develop a record sufficient for the district court (or this court) to find that he suffered a consequence that would chill a person of ordinary firmness from exercising First Amendment rights. We simply know nothing about the unit clerk job (other than its name) or the job Vreeland received after that. Declaring in argument that the subsequent job was "lesser" is not enough. *Cf. Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) ("While Dillon was understandably upset with being assigned clerical tasks that he viewed as beneath his position, under the circumstances presented in this case, this incident would not chill 'a person of ordinary firmness' from exercising his free speech rights."). On this basis, we affirm the district court's disposition of claim 4.

**D.    Claim 5**

Vreeland's claim 5 alleges that, in November 2013, Morgan, Wood, and another prison official told Vreeland that he had to stop filing grievances and

15

lawsuits or he would lose his new job and his single-cell living arrangement, and he would be transferred to a higher-security facility. Vreeland refused, and later that same day he was fired from his job assignment. The next day, he was transferred to a maximum-security facility, where he spent four days until being transferred again to a lower-security facility.

Defendants attacked claim 5 through CDOC records purporting to show that, months before November 2013, CDOC headquarters decided to transfer Vreeland as "part of the 'Close Custody Re-Alignment Program' in which hundreds of offenders were transferred to and from facilities throughout the state." R. vol. 6 at 343. In Vreeland's case, this process began in late February 2013 when a case manager named Ryan Fisher recalculated his custody rating (a numeric score that dictates an inmate's security classification). Vreeland's custody rating had been 93, requiring "close" custody (CDOC's most restrictive rating), R. vol. 6 at 497, but Fisher's February 2013 recalculation reduced that score to 3, requiring "minimum restrictive" custody (CDOC's second-least restrictive rating), *id.* at 498.[7] For unclear reasons, Fisher nonetheless recommended an "override to Medium [custody]," one step up from minimum restrictive. *Id.* Fisher also recommended that Vreeland be housed at a "level three facility." *Id.* Someone named Simon Denwalt approved that

[7] Defendants' summary judgment briefing stated that Vreeland's custody rating dropped to 2 (not 3), *see* R. vol. 6 at 335, but their evidence shows that Vreeland scored a 3 as of February or March 2013, *see id*. at 498. Vreeland agrees that, at the time of his transfer, his custody rating was 3. *See* R. vol. 7 at 26. Defendants cite the correct score (3) on appeal. *See* Aplee. Answer Br. at 12.

16

recommendation in early March 2013. *Id.*

Next, a CDOC computer record dated August 7, 2013, shows that CDOC directed Vreeland's transfer to a medium-security facility as part of the close custody realignment project. *See id.* at 495.

Finally, an event log maintained by Vreeland's case managers contains an entry for November 25, 2013, written by Hansen, stating that Vreeland "came up on the move sheet for a Level III Lateral, due to the Close Custody Re-Alignment Project." R. vol. 7 at 526. Vreeland was terminated from his job in preparation for the transfer, and CDOC carried out the transfer the next day.

According to defendants, this evidence demonstrated that Vreeland could not prove they caused his job termination or transfer. Vreeland countered with a CDOC employee incident report form produced during discovery. The form was filled out on November 26, 2013 (the day of Vreeland's transfer) by Buena Vista employee Bonnie Francis. Francis's reason for writing the report is unclear. Whatever the reason, Francis's narrative quoted Hansen apparently taking credit for Vreeland's transfer: "Later on after [Vreeland] had returned to receiving [to be transported to his new facility], [Case Manager] Hansen came up to me and said[,] [I]sn't that great, how I finally got him out of here[?]" R. vol. 7 at 580.

With this evidence as an anchor, Vreeland proposed to argue at trial that Hansen used the close custody realignment program as "the tool . . . to get [him] transferred." *Id.* at 26. Vreeland theorized that Hansen submitted a request in summer 2013 to have Vreeland included in the realignment project, but the request

17

was not approved until November 2013. *Id.* at 44–45. Vreeland offered no evidence supporting this theory. It was merely an attempt to keep his claim afloat despite the story told by the transfer paperwork.

The magistrate judge recommended granting defendants' motion and the district court ultimately agreed, reasoning that the evidence could only support a conclusion that Vreeland's transfer resulted from decisions made at CDOC headquarters regarding the close custody realignment project, not from anything that defendants orchestrated. Concerning the statement Francis attributed to Hansen, the court reasoned that it "cannot bear the weight that [Vreeland] places on it." R. vol. 8 at 128. Thus, the court granted summary judgment on claim 5.

On appeal, Vreeland primarily argues that "[t]he defense story and court ruling that [case manager] Fisher lowered points [in February 2013] to cause [his] transfer is patently false." Aplt. Opening Br. at 50. In support, Vreeland attaches an informal grievance and CDOC's response, both written in January of this year (*i.e.*, during this appeal). In that document, he asks CDOC to tell him when Fisher became his case manager, and CDOC responds that Fisher became his case manager in February 2015. Based on this, Vreeland argues that Fisher could not have lowered his custody rating in February 2013.

One can imagine numerous reasons, both innocent and not, why Fisher's name might appear on a document under the "case manager" title allegedly two years before he assumed that role toward Vreeland. But whatever we might imagine is presently irrelevant. "Our adversarial system endows the parties with the

18

opportunity—and duty—to craft their own legal theories for relief in the district court." *Richison*, 634 F.3d at 1130. Vreeland had at least two obvious opportunities—his summary judgment response brief, and his objection to the magistrate judge's recommendation—to argue to the district court that the Fisher document was a fake. He never did.[8] He therefore forfeited the argument, and his "failure to argue for plain error and its application on appeal . . . surely marks the end of the road." *Id.* at 1131. Thus, we do not reach it.

Vreeland also argues that other evidence supports his theory that Hansen used the close custody realignment project as the tool to have Vreeland transferred. The only evidence he cites is the August 7, 2013 CDOC computer record described above, which shows CDOC's approval to transfer Vreeland to a medium-security facility. It says nothing about Hansen. *See* R. vol. 6 at 495.[9]

Thus, the only competent evidence in the summary judgment record of Hansen's (or any other defendant's) involvement in Vreeland's transfer from Buena Vista was: (i) Vreeland's own declaration, in which he says that defendants threatened him with a job loss and transfer if he would not drop his grievances and

---

[8] To the contrary, in his summary judgment response brief he relied on the Fisher document (although without saying anything specifically about Fisher) to show that his custody rating dropped to 3 in early March 2013, in contrast to defendants' mistaken assertion that it had dropped to 2. *See* n.7, *supra*. Vreeland also presumably has personal knowledge (a rough memory, at least) of who his case manager has been at any particular time.

[9] Vreeland also attempts to support his argument with information regarding CDOC's transfer process generally—information he learned through the grievance he submitted in January of this year. Like the information about Fisher, this was not before the district court and so we do not consider it.

lawsuits; (ii) the undisputed fact that he indeed lost his job and was transferred shortly after the alleged threat; and (iii) Francis's report that Hansen claimed credit for the transfer. Under the circumstances, we agree with the district court that the jury could only reasonably find that Vreeland's transfer was orchestrated by individuals other than defendants, even if those defendants threatened or claimed credit for it. In other words, his transfer would have happened no matter what, and so was not caused by any of them. On this basis, we affirm the grant of summary judgment against claim 5.[10]

### E.    Costs

Vreeland argues that the district court erroneously awarded costs to CDOC, a non-party. However, Federal Rule of Civil Procedure 54(d)(1) states, "On motion served within the next 7 days [after taxation of costs], the court may review the clerk's action." A party that "fail[s] to request the district court to review the clerk's award" under Rule 54(d)(1) "waive[s] the right to judicial review." *Bloomer v. United Parcel Serv., Inc.*, 337 F.3d 1220, 1220–21 (10th Cir. 2003).

Here, the district court deputy clerk taxed costs on September 17, 2019. Vreeland did not file a Rule 54(d)(1) motion (timely or otherwise). Rather, he filed

---

[10] Having found that all of Vreeland's claims fail on their merits, we need not reach the argument that the district court misinterpreted our prior mandate when it refused to allow Vreeland to assert any type of claim other than First Amendment retaliation. The claims Vreeland sought to assert outside of First Amendment retaliation would have failed for the same reasons described above (untimeliness, failure to exhaust, and lack of evidence). And because all claims fail, we also need not reach Vreeland's arguments about supervisory liability, nor his argument that the district court improperly rejected his request for a novel form of injunctive relief.

objections to defendants' bill of costs *before* the deputy clerk taxed costs, which the deputy clerk overruled in his September 17 order. Vreeland does not argue that an objection filed before taxation of costs, and ruled upon within the taxation of costs, nonetheless persists in some sense and therefore qualifies as a Rule 54(d)(1) motion.

"[P]ro se parties [must] follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (internal quotation marks omitted). Vreeland failed to follow Rule 54(d)(1)'s procedure for challenging taxation of costs, and has therefore waived appellate review of that issue. We dismiss this portion of his appeal.

## III.  CONCLUSION

We affirm the district court's judgment on the merits. We dismiss the appeal to the extent Vreeland challenges the district court's award of costs. Finally, we grant Vreeland's motion to proceed without prepayment of costs or fees on appeal.

Entered for the Court


Joel M. Carson III
Circuit Judge

21