**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHAWN SHELTRA,

*Plaintiff-Appellant*,

v.

JAY CHRISTENSEN, Warden; D.W. MCKAY; D. W. DIETZ; TAYLOR, Sgt.; FRAHS, Cpl.; CRAIG, C/O,

*Defendants-Appellees*.

No. 21-35374

D.C. No. 1:20-cv-00215-DCN

OPINION

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted May 8, 2024
Pasadena, California

Filed December 31, 2024

Before: Richard C. Tallman, Danielle J. Forrest, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Forrest;
Dissent by Judge Bumatay

**SUMMARY**[*]

## Prisoner Civil Rights/Exhaustion of Administrative Remedies

The panel reversed the district court's grant of summary judgment for Idaho prison officials based on Idaho Department of Corrections inmate Shawn Sheltra's failure to exhaust his administrative remedies, and affirmed the district court's grant of summary judgment for defendants as to Sheltra's claims brought against defendants in their official capacity.

Sheltra filed a formal grievance in March identifying safety concerns from other inmates in his housing unit, including that he would be attacked in April if he did not make a demanded extortion payment. After being shortly isolated, Sheltra was returned to his housing unit, and in April, he was attacked by another inmate. Sheltra filed suit thereafter, asserting violations of the Eighth and Fourteenth Amendments based on defendants' failure to protect him from a known harm. The district court dismissed the action for failure to exhaust administrative remedies because Sheltra did not file a formal grievance after the April attack.

The panel adopted the continuing-violations doctrine for purposes of administrative exhaustion under the Prison Litigation Reform Act (PLRA). Under the doctrine, a properly exhausted prison grievance asserting one continuing harm or a single course of conduct can exhaust events arising out of the same alleged violation that occur

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

after the grievance was made. The panel joined sister circuits who have held that an inmate need not file repeated grievances if the inmate has identified one continuing harm or a single course of conduct of which later events are a part. The doctrine applied here because Sheltra's attack was part of the same continuing harm or course of conduct that he described in his prison grievance before the attack. The panel, therefore, reversed the district court's summary judgment on Sheltra's individual-capacity claims against defendants.

The panel affirmed the district court's grant of summary judgment for defendants on Sheltra's official-capacity claims because, as Sheltra conceded, these claims are barred by the Eleventh Amendment.

Dissenting, Judge Bumatay wrote that although he agreed with the majority that the continuing violation doctrine could apply to PLRA exhaustion, it did not apply in this case. The continuing violation doctrine only applies to longstanding prison policies or conditions and recurring incidents of the same harm. It has never meant that one incident automatically satisfies exhaustion for any future related claims. Had Sheltra filed a grievance after the attack, the substance of that grievance would have been markedly different than his earlier submissions. But because Sheltra filed suit before filing another grievance, he deprived officials of the time and opportunity to address his attack. He, therefore, could not avail himself of the continuing violation doctrine.

## COUNSEL

Aaron Littman (argued), UCLA School of Law, Prisoners' Rights Clinic, Los Angeles, California, for Plaintiff-Appellant.

Aaron M. Green (argued), Deputy Attorney General; James E.M. Craig, Chief, Civil Litigation and Constitutional Defense; Joshua N. Turner, Acting Deputy Solicitor General; Raul R. Labrador, Attorney General; Office of the Attorney General, Boise, Idaho; for Defendants-Appellees.

## OPINION

FORREST, Circuit Judge:

The question presented is whether Plaintiff-Appellant Shawn Sheltra, an inmate with the Idaho Department of Corrections (IDOC), administratively exhausted his failure-to-protect claim asserted against prison officials Jay Christensen, David Dietz, Travis Taylor, and Benjamin Frahs (Defendants) as required by the Prison Litigation Reform Act (PLRA). The answer to this question depends on whether we adopt the continuing-violations doctrine as applied to the PLRA's administrative-exhaustion requirement and whether the continuing-violations doctrine applies to Sheltra's case. If the doctrine applies, Sheltra's complaints to prison officials about threats that he received before he was attacked exhausted his failure-to-protect claim. If the doctrine does not apply, then Sheltra did not exhaust the claim presented here because he did not separately grieve the attack.

We adopt the continuing-violations doctrine for PLRA administrative exhaustion purposes and conclude that it applies here because Sheltra's attack was part of the same continuing harm or course of conduct that he described in his prison grievance before the attack. In doing so, we join our sister circuits who have held that an inmate need not file repeated grievances if the inmate has identified one continuing harm or a single course of conduct of which later events are a part. *See Morgan v. Trierweiler*, 67 F.4th 362, 369–70 (6th Cir. 2023) (identifying Fifth and Sixth Circuit cases applying the continuing-violations doctrine in the PLRA context, as well as numerous district court cases); *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (citing Fifth, Sixth, Tenth, and Eleventh Circuit cases applying the continuing-violations doctrine in the PLRA context). Thus, we reverse the district court's grant of summary judgment for Defendants based on Sheltra's failure to exhaust his administrative remedies, as required by the PLRA. But we affirm the district court's grant of summary judgment for Defendants as to Sheltra's official-capacity claims because these claims are barred by the Eleventh Amendment.

## I.  BACKGROUND

### A.  IDOC's Grievance Procedures

When an inmate has a problem that affects himself or the inmate population generally, IDOC's grievance and informal resolution process requires that the inmate first try to resolve the problem by talking with a prison staff member. If this does not resolve the inmate's problem, the inmate may submit an Offender Concern Form. Where the prison's response to this form does not resolve the problem, or where the prison does not respond within seven days, the inmate may submit a formal Grievance Form within 30 days of the

incident or another Offender Concern Form. The Grievance Form must document the inmate's informal efforts to resolve the problem, raise only one issue, and suggest a solution to the problem raised. An inmate may also appeal an unsatisfactory response to his grievance. Once a prisoner has administratively appealed his unsatisfactory grievance response and received a decision, he has administratively exhausted the IDOC grievance process as required by the PLRA.

Once an inmate exhausts this grievance process, IDOC's policy bars him from submitting another grievance addressing the same issue. There are limited exceptions to this bar, including "[w]hen a specific issue was not addressed in a previous grievance even though the issue was based on the same incident."

## B.      Sheltra's Exhaustion Efforts

On February 14, 2020, Sheltra was placed in housing unit D-1. That same day, he submitted three Offender Concern Forms. The first one was sent to Deputy Warden McKay and stated that: (1) an inmate who had previously threatened Sheltra was housed in D-1; (2) Sheltra had been assaulted the previous day; and (3) Sheltra worried that he would be attacked again because he was a medium-security inmate being placed with maximum-security offenders (Concern Form 1). The second form was sent to the shift command and stated that Sheltra had been warned of an impending attack by inmate Young (Concern Form 2). The third form was sent to Defendant Taylor, reminding him that Sheltra had communicated his security concerns before being placed back in unit D-1 and warning Taylor that if an inmate attacked Sheltra, it would be due to prison officials' failure to protect him (Concern Form 3).

Three days later, on February 17, Sheltra sent a fourth Offender Concern Form to Defendant Frahs stating that someone told Sheltra that inmate Young and others were "coming down," which Sheltra asserted proved his previous statement that Young came to Sheltra's cell on February 14 (Concern Form 4). On February 18, Defendant Taylor responded to Concern Forms 2 and 3, telling Sheltra that there were no documented safety concerns and suggesting that Sheltra contact Investigations if he felt unsafe.

Sheltra sent a fifth Offender Concern Form on February 20 to Defendant Frahs (Concern Form 5). He asserted that Frahs was failing in his duty to keep Sheltra safe, that Sheltra had reported he was being extorted, and that Frahs should report the extortion. On February 21, Deputy Warden McKay responded to Concern Form 1, advising Sheltra to contact Security if he wanted to be moved. On February 25, Frahs responded to Concern Forms 4 and 5, stating that he had relayed Sheltra's concerns to Investigations.

Unsatisfied with Defendants' responses, Sheltra filed a formal grievance on March 10. He identified "two safety concerns on D-1"—threats and extortion—and explained that he was threatened his first day on D-1 and had already been forced to pay $30.00 in extortion. As his proposed solution, Sheltra requested to be moved back to D-2, which is a medium-security housing unit. Sheltra's grievance was denied because he had "no active safety concerns with any inmates" and because other misbehavior did not warrant him being placed in D-2. One reviewing official also accused Sheltra of "attempting to manipulate housing in order to be housed around another offender that [he was] romantically involved with."

On March 31, Sheltra appealed his formal grievance denial, asserting that Young and two other named inmates threatened that if he did not make a demanded extortion payment by April 10, he would be attacked. Warden Christensen responded to his appeal on April 2, accusing Sheltra of launching an extortion ring with other inmates and advising Sheltra that he would be "isolated for the course of [the] investigation" into the extortion scheme. But after a short period in isolation, Sheltra was returned to housing unit D-1. And on April 17, he was attacked by another inmate. Sheltra claims his attacker was paid by an inmate that he identified in his grievance. Sheltra was beaten so severely that his one good eye was swollen shut for several weeks, rendering him blind (Sheltra's other eye previously had been surgically removed). Even after the swelling subsided, Sheltra's vision remains permanently impaired. He also alleges that he suffers from headaches, severe neck pain, and mental issues caused by the attack.

Over three months later, Sheltra submitted an Offender Concern Form asking for permission to submit an untimely grievance related to the April attack, but his request was summarily denied.

## C.  District Court Proceedings

Approximately two weeks after the April attack, Sheltra filed a lawsuit pro se in federal district court. His operative complaint asserts violations of the Eighth and Fourteenth Amendments based on Defendants' failure to protect him "from a known harm." Specifically, Sheltra alleges that he "filed a Grievance before the 4/17/2020 assault, alerting the named Defendants that the assault was going to happen," and "they did nothing to prevent it from happening."

Defendants characterized Sheltra's claim as related only to the April attack, and they moved for summary judgment, arguing that Sheltra failed to exhaust his administrative remedies because he did not file a grievance after the April attack. Sheltra countered that his claim was not based solely on his April attack but on Defendants' failure to protect him from an ongoing threat that he identified in his pre-attack grievance. He also noted that prison policy barred him from grieving the same problem multiple times.

The district court accepted Defendants' characterization of Sheltra's claim, and, relying on *Perry v. Dickinson*, No. 2:10-cv-3223 KJN P, 2012 WL 2559426 (E.D. Cal. June 29, 2012), it rejected Sheltra's argument that his March grievance exhausted his administrative remedies for the April attack. Specifically, the district court concluded that because Sheltra sued for "an attack that happened *after* he filed his grievance," per IDOC policy, he could only exhaust his administrative remedies by submitting another grievance within 30 days after the attack.

The district court also rejected Sheltra's three alternative arguments. First, it concluded that Sheltra would not have been barred from grieving the April attack because that event was not the subject of his prior grievance, which discussed threats of attack and extortion. Second, it rejected Sheltra's "*post-hoc*" argument that he should have been allowed to grieve the April attack beyond the 30-day deadline because the attack impaired his vision, noting that when Sheltra asked for the extension, he only mentioned a safety concern. And third, it rejected Sheltra's argument that IDOC policy does not allow grievances for a failure-to-protect claim. The district court dismissed Sheltra's lawsuit without prejudice for "fail[ure] to properly exhaust his available administrative remedies regarding the April 17, 2020 attack prior to filing

[his] suit." The court declined to address Defendants' Eleventh Amendment challenge to Sheltra's official-capacity claims.

Sheltra moved for reconsideration, emphasizing that Defendants and the district court had mischaracterized the basis of his claim. The district court denied his motion, and Sheltra appealed.

## II.  DISCUSSION

We review de novo the grant of summary judgment for prison officials based on an inmate's failure to exhaust his administrative remedies as required by the PLRA. *Fordley v. Lizarraga*, 18 F.4th 344, 350 (9th Cir. 2021).

Sheltra argues that he fully exhausted his failure-to-protect claim through his March grievance and earlier informal complaints. Specifically, he contends that he was not required to grieve the April attack because Defendants violated his Eighth Amendment rights when they failed to protect him once they were on notice that they had placed him in conditions that exposed him to substantial harm. Citing *Wilk v. Neven*, 956 F.3d 1143, 1146–50 (9th Cir. 2020), he argues that any ensuing harm, including the April attack, is simply evidence confirming the substantial risk of serious harm Sheltra warned officials he faced. He also urges us to adopt the continuing-violations doctrine as applied to the PLRA administrative-exhaustion requirement, in alignment with many of our sister circuits.

Defendants disagree, asserting that Sheltra's March grievance could not have exhausted his claim asserted in this lawsuit because he seeks damages for an attack that occurred after his grievance was resolved. Citing *Ngo v. Woodford*, 539 F.3d 1108, 1009–11 (9th Cir. 2008), Defendants further

contend that we have held the continuing-violations doctrine does not apply in cases subject to the PLRA.

## A. Failure-to-Protect Claims

A prison official's failure "to protect prisoners from violence at the hands of other prisoners" violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994). First, the risk the inmate is facing "must be, objectively, sufficiently serious." *Id.* at 834 (internal quotation omitted). Second, prison officials must act with "deliberate indifference to inmate health or safety," meaning that they have subjective knowledge that the inmate faces "a substantial risk of serious harm." *Id.* at 834, 837 (internal quotation omitted). This second requirement can be established based on a known *threat* of harm. *See Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *see also*, *Farmer*, 511 U.S. at 834 ("For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.").

Although the Supreme Court has expressly declined to decide at what point a threat of attack violates the Eighth Amendment, *Farmer*, 511 U.S. at 834 n.3, we have held that explicit threats made against a particular inmate that are reported to prison officials trigger a duty to protect. *See, e.g.*, *Wilk*, 956 F.3d at 1149–50 (holding that a threat against an inmate created a "substantial risk of serious harm" to the inmate, and "prison officials must 'take reasonable measures to mitigate the [known] substantial risk[s]' to a prisoner.") (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016)); *Cortez v. Skol*, 776 F.3d 1046, 1049, 1052 (9th Cir. 2015) (observing that a prison official showed "deliberate indifference" by transporting inmates without

backup when he knew that one inmate was potentially in danger); *Clem v. Lomeli*, 566 F.3d 1177, 1181–82 (9th Cir. 2009) (holding that a properly instructed jury could find that a prison official's failure to respond to an inmate's call for help constituted "deliberate indifference"); *see also Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 n.12 (11th Cir. 2007) (concluding that "gang-related threats made on [the inmate's] life, which were explicitly reported to prison officials, present a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act."); *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 767, 770–71 (4th Cir. 2003) (concluding that an inmate's Eighth Amendment claim survived summary judgment where an inmate-on-inmate attack resulting in "significant physical injury" was preceded by death threats and the officers were "aware of the risk of harm and simply ignored it").

## B.      Exhaustion of Administrative Remedies

### 1.

The PLRA requires inmates to exhaust administrative remedies before filing suit: "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). The requirement that an inmate fully exhaust the administrative remedies made available both "give[s] the agency a fair and full opportunity to adjudicate [the complaint]" and "impos[es] some orderly structure on the course of [the prison's] proceedings." 548 U.S. at 90–91. The exhaustion requirement also "'improv[es] litigation that does occur by leading to the preparation of a useful record.'" *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (quoting

*Jones v. Bock*, 549 U.S. 199, 219 (2007)). "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

As an initial matter, we reject Defendants' assertion that Sheltra's prison complaints could not have exhausted his Eighth Amendment claim because he could not have sought money damages before the attack occurred. While the relief available to Sheltra before he was attacked may have been limited to nominal damages or injunctive relief, "a violation of the Eighth Amendment does not turn on the type [of] relief sought." *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001); *see also Carey v. Piphus*, 435 U.S. 247, 255 (1978) (analyzing separately whether a constitutional violation occurred and whether the violation caused compensable injury).

The primary dispute regarding whether Sheltra properly exhausted his administrative remedies is whether his pre-attack grievance covers the attack or whether Sheltra was required to grieve that event separately. The resolution of this dispute hinges on the continuing-violations doctrine, and whether we choose to adopt it in the context of the PLRA's administrative-exhaustion requirement. There are two applications of this doctrine discussed by the parties. First, courts have applied the continuing-violations doctrine to extend filing deadlines under the reasoning that where a violation is ongoing, the limitations period begins anew each day the violation continues. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982) (when an "unlawful practice . . . continues into the limitations period," the limitations period restarts after each "asserted occurrence of that practice."). Second, courts have applied the continuing-violations doctrine in the context of exhaustion of administrative remedies under the PLRA to treat events

occurring after an inmate's grievance as nonetheless exhausted when the later-occurring events are part of the single continuing harm or course of conduct that the inmate grieved. *See, e.g.*, *Morgan*, 67 F.4th at 369–70.

Defendants are correct that we have rejected the deadline-extending application of the continuing-violations doctrine in the PLRA context. *Ngo*, 539 F.3d at 1109–10 (holding that the continuing-violations doctrine did not apply to restart the prisoner grievance limitations period when the inmate merely alleged continuing *effects* of the harmful conduct). But Defendants' assertion that Sheltra's invocation of the continuing-violations doctrine here must also necessarily fail is unpersuasive. Sheltra is advancing the second application of the continuing-violations doctrine: that his prison grievance administratively exhausted his claim seeking relief for a later-occurring attack because the attack was part of the same continuing harm or course of conduct that he previously grieved.

Several of our sister circuits have adopted the application of the continuing-violations doctrine that Sheltra advances here. *See Turley*, 729 F.3d at 650 (citing Fifth, Sixth, Tenth, and Eleventh Circuit cases discussing and applying the continuing-violations doctrine in the context of PLRA administrative exhaustion); *Morgan*, 67 F.4th at 369–70 (identifying Fifth and Sixth Circuit cases applying the continuing-violations doctrine in the context of PLRA administrative exhaustion, as well as numerous district court cases). Most recently, the Sixth Circuit held in a PLRA administrative exhaustion case that "[w]here there is one, continuing harm or a single course of conduct (which can lead to discrete incidents of harm), filing repeat grievances is unnecessary." *Id.* (internal quotation omitted).

In *Morgan*, the plaintiff brought a First Amendment Free Exercise claim, arguing that the defendants denied him Halal meals on an ongoing basis. *Id.* at 368. The plaintiff's grievance listed a date range for when the claimed constitutional violation occurred, and his federal complaint alleged that prison officials continued to deny him Halal meals after the date range specified in his grievance. *Id.* The Sixth Circuit rejected the defendants' argument that each meal denial was a discrete event that required a separate grievance. *Id.* at 370–71. Instead, recognizing that the nature of the plaintiff's challenge was consistent over time and "reflect[ed] an attempt to resolve a single course of unconstitutional conduct," the court held that the plaintiff's grievance fully exhausted his Free Exercise claim, which included the allegedly unconstitutional conduct that occurred after he filed his grievance. *Id.* at 368, 370–71. The court explained that where the plaintiff grieved that he was continuously being denied religious meals, requiring him to grieve after every individual meal denial "would be an unwarranted expectation given that [his] allegations were broader than a single meal." *Id.* at 370–71. To illuminate its reasoning, the court distinguished the plaintiff's case from a PLRA administrative exhaustion case involving the denial of inmate mail where the court declined to apply the continuing-violations doctrine because the inmate had not claimed "he had been denied mail consistently" but rather challenged "certain pieces of mail rejected under different facts and policies." *Id.* at 370 (citing *Siggers v. Campbell*, 652 F.3d 681 (6th Cir. 2011)).

The Fifth Circuit relied on similar reasoning in *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004), to apply the continuing-violations doctrine in the PLRA administrative exhaustion context. There, the inmate plaintiff was sexually

assaulted repeatedly over 18 months. *Id.* at 512–13. The plaintiff used the prison's "formal two-step administrative grievance process on several occasions," but officials denied his requests to be placed in protected status or moved because "unit officials or [classification] committees had already conducted proper investigations and had found no substantiating evidence." *Id.* at 513. The defendants argued that because the plaintiff had filed only a grievance alleging "near-constant sexual assault," instead of filing a grievance after each incident, he failed to exhaust any claims related to his post-grievance assaults. *Id.* at 519. The Fifth Circuit rejected this argument, concluding that the plaintiff's grievance was "sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault." *Id.* at 521. It reasoned that "[i]t would make little sense to require" the plaintiff "to file repeated grievances reminding the prison officials that he remained subject to attack in the general population," especially because prison policy prohibited repetitive grievances. *Id.*

In both *Morgan* and *Johnson*, as well as in other circuit cases that have adopted Sheltra's proposed application of the continuing-violations doctrine, the courts applied the doctrine even though prison officials investigated the violations the inmates initially grieved. This is because the crucial question in evaluating the merits of a continuing Eighth Amendment violation is not whether prison officials ever performed an investigation into the inmate's grieved violation, but whether prison officials were aware that the complaining inmate faced a substantial risk of harm and acted unreasonably despite such knowledge. *See Wilk*, 956 F.3d at 1148–49 ("Once an official is subjectively aware of a substantial risk of harm, . . . the official [must] take reasonable measures to mitigate the substantial risk.") *see*

*also, e.g.*, *Morgan*, 67 F.4th at 364–65, 370–71; *Johnson*, 385 F.3d at 516, 520; *Howard v. Waide*, 534 F.3d 1227, 1239–40 (10th Cir. 2008) (applying the continuing-violations doctrine where inmate who filed multiple grievances about assaults that were previously investigated by prison officials established that prison officials had objective and subjective knowledge of a substantial risk of harm and acted unreasonably).

These cases are persuasive, and we now hold that under the continuing-violations doctrine, a properly exhausted prison grievance asserting "one, continuing harm or a single course of conduct" can exhaust events arising out of the same alleged violation that occur after the grievance was made. *Morgan*, 67 F.4th at 369–70 (internal quotation omitted). We now turn to whether this doctrine applies in Sheltra's case.

2.

Sheltra's February informal prison complaints stated, among other things, that he was threatened the first day that he was returned to unit D-1, that inmate Young came to his cell and threatened to fight, that another inmate came to his cell stating that inmates associated with Young were coming, and that prison officials had failed to respond to his safety concerns and were failing to protect him. His formal grievance filed in March expressed "two safety concerns"— threats and extortion. He explained that he was "put on a walk with an offender who [he] named on [his] debrief papers" and that he was threatened by two inmates on his first day in D-1. And he asserted that officials were refusing to protect him and he needed to be moved. In his appeal of the denial of his grievance, Sheltra named three inmates who were threatening him and claimed he feared that if he did not

pay their extortion demand by April 10, he would be attacked.

Under these circumstances, we conclude that Sheltra grieved a continuing harm or single course of conduct— prison officials failing to protect him from a specifically identified threat posed by inmates in his housing unit. While he referenced some discrete events and interactions in his inmate complaints, taken in context, they all related to a singular ongoing risk of harm. And his post-grievance attack likewise related to the same continuing harm that he previously grieved. After Sheltra was returned to unit D-1 from isolation, he was brutally attacked on April 17 by an inmate who he claims was paid by one of the inmates he identified in his grievance process as having threatened him. Contrary to Defendants' assertion, Sheltra's failure to name his ultimate attacker in his grievance does not mean that his attack was independent of the threats that he previously grieved. *Cf. Farmer*, 511 U.S. 843 (prison officials may not "escape liability for deliberate indifference by showing that . . . [they] did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."); *Howard*, 534 F.3d at 1240 ("[The inmate] is certainly not required to give notice of who precisely is behind the threat.").

We find unpersuasive Defendants' and the dissent's efforts to distinguish the cases in other circuits applying the continuing-violations doctrine to post-grievance events. For example, Defendants contend that *Johnson* is inapplicable because the prison in that case prohibited repetitive grievances and IDOC permits such grievances in some circumstances. And the dissent contends that *Johnson* is distinguishable because there the inmate grieved some of the "near-constant" assaults that he suffered, 385 F.3d at 519,

but here Sheltra grieved only threats, not his assault. These arguments ignore the crux of *Johnson*'s holding as it relates to Sheltra's theory of liability.

In *Johnson*, the Fifth Circuit held that the inmate's grievances of some of the assaults he suffered were sufficient to cover subsequent physical and sexual assaults because "the same condition of confinement of which he had been complaining continued" and prison officials had notice of the problem. *Id.* at 519–20, 23. The same is true here. Sheltra's claim is that prison officials were made aware of the threats that he faced in his housing unit through his informal complaints and formal grievance and that the Defendants failed to protect him from those threats, *as evidenced by* the assault that he suffered allegedly at the hands of those that he had identified as threatening him. Contrary to the dissent's suggestion, the assault did not present a new problem or condition that the Defendants were not given an opportunity to address. For this same reason, the dissent's discussion of *Siggers* and *Moore v. Bennette*, 517 F.3d 717 (4th Cir. 2008), is unpersuasive because both of those cases clearly involved inmates raising similar *but different* problems—the rejection of mail for different reasons under different prison policies and inadequate medical care related to different conditions.[1] *Moore*, for example, involved separate complaints about Hepatitis C and gout; under the dissent's logic, though, the continuing-violations doctrine would not apply when a prisoner's

---

[1]The dissent's concern that we have not identified how Defendants acted unreasonably in responding to Sheltra's report of threats is misplaced. This is the focus of the merits analysis of an Eighth Amendment failure-to-protect claim, not whether an inmate has exhausted his Eighth Amendment claim, which is the question we must decide in this appeal.

unheeded grievance for untreated stage 3 cancer predictably allows the disease to progress to stage 4.

Defendants and the dissent also attempt to distinguish *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215 (11th Cir. 2010). In that case, the plaintiff alleged that a prison doctor violated the Eighth Amendment by not ensuring that the plaintiff received a consultation with an orthopedic specialist, as recommended by other prison medical professionals. *Id.* at 1217. Defendants argue that *Parzyck* "rests on the principle that an offender need not identify specific staff members in a grievance before naming them as Defendants." While *Parzyck* does establish this principle, it also applied the continuing-violations doctrine, concluding that the plaintiff "was not required to initiate another round of the administrative grievance process on the exact same issue each time another request for an orthopedic consultation was denied." 627 F.3d at 1219. The dissent also tries to distinguish *Parzyck*, as involving repeated incidents happening over a length of time. However, the Tenth Circuit also highlighted that the plaintiff was not required to file a new grievance to address "every subsequent act . . . that contributes to the continuation of a problem already raised in an earlier grievance." *Id.* As we explained above, Sheltra's attack was allegedly a "continuation of a problem" that he had already grieved, making *Parzyck*'s reasoning applicable here.

In sum, Sheltra is not asserting in this case a new harm or course of conduct from that which was the subject of his prison complaints. Thus, we conclude that the continuing-violations doctrine applies and his March grievance process administratively exhausted his April attack. There would be little value in requiring Sheltra to separately grieve every new interaction or event related to the ongoing threats that

he had already grieved because the purposes of exhaustion were satisfied. Defendants were made aware of the risk of harm that Sheltra claimed he faced and his contention that prison officials were failing to protect him, and they had a full opportunity, under the procedures adopted by the prison, to address Sheltra's concerns before this litigation was filed. *See Woodford*, 548 U.S. at 89. Sheltra's informal and formal complaints also created a record to aid the litigation of his claim. *See Fuqua*, 890 F.3d at 844.

## C. Eleventh Amendment Immunity

Sheltra concedes that the Eleventh Amendment mandates dismissal of his official-capacity claims asserted against Defendants. We affirm the district court's grant of summary judgment in favor of Defendants on those claims.

## III. CONCLUSION

Because the district court did not have the benefit of our new rule applying the continuing-violations doctrine on these facts, the district court's grant of summary judgment is **REVERSED IN PART** as to Sheltra's individual-capacity claims and **AFFIRMED IN PART** as to Sheltra's official-capacity claims asserted against Defendants, and this case is **REMANDED** for further proceedings consistent with this opinion.[2]

---

[2] Defendants shall bear costs on appeal.

BUMATAY, Circuit Judge, dissenting:

A prisoner is not exempted from the exhaustion requirements of the Prison Litigation Reform Act ("PLRA") just because he filed an earlier grievance that relates to a later incident. More is required. The PLRA demands officials be afforded "time and opportunity to address complaints internally" before an inmate runs to court. *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). That requirement means "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." *Brown v. Valoff*, 422 F.3d 926, 934 (9th Cir. 2005) (quoting 42 U.S.C. § 1997e(a)). So when a prison reasonably investigates a prisoner's grievance and reaches a conclusion—even if it gets the problem wrong, the prisoner must file a separate grievance for a later incident.

Of course, some circuits have rightfully recognized an exception to this exhaustion requirement when a prisoner complains of a "continuing violation." *See*, *e.g.*, *Morgan v. Trierweiler*, 67 F.4th 362, 370 (6th Cir. 2023) (simplified). In those cases, a prisoner need not continue exhausting administrative remedies when an earlier grievance provides "prison administration with notice of, and an opportunity to resolve, the same problem." *Johnson v. Killian*, 680 F.3d 234, 238–39 (2d Cir. 2012). Typically, these exceptions relate to ongoing prison policies or recurring incidents, so requiring a grievance after every incident makes less sense.

That's not the case here. Shawn Sheltra filed a single grievance and appeal listing concerns about threats and extortion. Officials at the Idaho Department of Corrections ("IDOC") investigated those very threats. They removed Sheltra from his cell, investigated the allegations of extortion, and concluded—based on the evidence—that

Sheltra was a part of the extortion ring. After the investigation, Sheltra was attacked. He claims one of the three individuals he named in his grievance paid for the attack. But the earlier grievance didn't permit IDOC to address and investigate the later *attack*. IDOC officials investigated the threats of extortion and assessed Sheltra wasn't facing any safety issues—it seems they got that wrong. But that doesn't undo the PLRA's exhaustion requirement for Sheltra. So while I agree with the majority that the continuing violation doctrine could apply to PLRA exhaustion, it doesn't apply here.

Because the majority mistakenly applies the continuing violation doctrine, I respectfully dissent.

## I.

Shawn Sheltra filed a grievance on March 10, 2020, listing "two safety concerns"—"threats and extortion." As a Level 1 response, an IDOC official stated that Sheltra would not be moved from his current housing because his behavior was "not acceptable on a medium custody tier." At Level 2, another IDOC official responded that Sheltra's current housing was "appropriate based off of [his] consistent behavioral issues" and that it appeared Sheltra was "manipulat[ing] housing" to be located closer to a prisoner he was romantically involved with. On March 31, Sheltra appealed those responses and gave the names "Walton, Young, now Willard" as prisoners extorting him. He claimed that if he didn't pay them, they would attack or rape him. At Level 3, an IDOC official acknowledged that—based on "complaints from the public and others victimized in this extortion ring"—Sheltra was being investigated as part of an extortion scheme and would be isolated during that investigation.

On April 17, Sheltra was attacked by an unnamed prisoner who he claims was paid by one of the prisoners who threatened him. He never filed a grievance after the attack. Instead, he filed a complaint in federal court on April 30, 2020.

## II.

### A.

Under the PLRA, a prisoner must exhaust all available remedies before commencing a federal action. *Woodford v. Ngo*, 548 U.S. 81, 87–88 (2006). That's because "[e]xhaustion gives an agency" the "opportunity to correct its own mistakes . . . before it is haled into federal court" and so "discourages disregard of the agency's procedures." *Id.* at 89 (simplified). Substantively, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

Sheltra didn't file a grievance within 30 days following the attack, as IDOC policy required. So he relies on the before-the-attack grievance to suffice for exhaustion of IDOC's administrative remedies. In other words, Sheltra asks us to apply the continuing violation doctrine here to save his otherwise-barred claim.

### B.

So far, seven circuits have applied the continuing violation doctrine to PLRA exhaustion when an earlier grievance gave officials notice and opportunity to correct a prisoner's problem. Three of those cases involved grievances concerning prison policies or longstanding conditions. *See Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (continued rejection of Rastafarian services over

three months); *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (prison lockdown policy in place for over two years); *Johnson*, 680 F.3d at 238–39 (congregational prayer policy challenged for two years).

The other four cases involved repeated incidents happening over a length of time. *See Morgan*, 67 F.4th at 369–71 (daily denial of Halal meals for three months); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218–19 (11th Cir. 2010) (continued denial of orthopedic consultations over seven months); *Howard v. Waide*, 534 F.3d 1227, 1244–45 (10th Cir. 2008) (continued attacks from same prison gang for at least five months); *Johnson v. Johnson*, 385 F.3d 503, 519–21 (5th Cir. 2004) (continued failure to protect prisoner from "near-constant" sexual assault over eighteen months).

Those cases stand for the unremarkable proposition that "[i]n order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley*, 729 F.3d at 650, *see also Howard*, 534 F.3d at 1244 ("[F]urther grievances complaining of the same living situation would have been redundant."). But a prisoner only satisfies "the purpose of the exhaustion requirement" when "a prison has received notice of, and an opportunity to correct, a problem." *Turley*, 729 F.3d at 650. That is, grievances that "were not adequate to put prison officials on notice" of a problem "fail[ed] to meet [the] PLRA's exhaustion requirement." *Howard*, 534 F.3d at 1245 (rejecting related claims because they failed to provide officials with notice of problem).

*Johnson* makes clear that grieving a single incident doesn't exhaust all future related claims. "[W]e do not here

hold that a grievance filed in response to one particular incident automatically exhausts claims that arise from future incidents of the same general type." *Johnson*, 385 F.3d at 521 n.13. That meant "an inmate who claim[ed] to have been beaten by guards (or . . . not protected by guards) once one month and again the next month can rightfully be expected to grieve both incidents." *Id.*

Instead, *Johnson* involved "a horrific series of events" and egregious failures of prison officials to protect the plaintiff. *Id.* at 512. There, the plaintiff suffered sexual assaults "virtually every day" for over eighteen months, yet prison officials continually refused to address this "near-constant sexual assault." *Id.* at 519, 521. The plaintiff asked officials to place him in safekeeping status on at least seven occasions over that timeframe, but each was denied. *Id.* at 513. Confronting those harrowing facts, the Fifth Circuit concluded that Johnson failed to file grievances within fifteen days of many incidents, as required under prison policy, but "[a]s a practical matter, Johnson could not have been expected to file a new grievance every fifteen days, or each time he was assaulted" when the problem occurred constantly. *Id.* at 521. The court dismissed Johnson's other claims against two prison officials because his grievances "d[id] not . . . alert [prison officials] to, or give them an opportunity to remedy, the discrete conduct that form[ed] the basis of Johnson's claims against the[] two officers, which [wa]s of a different character [than his other claims]." *Id.* at 522.

By that same logic, two circuits have declined to apply the doctrine to grievances involving separate incidents. *See Siggers v. Campbell*, 652 F.3d 681, 693 (6th Cir. 2011) (each rejection of mail occurred for separate reasons); *Moore v. Bennette*, 517 F.3d 717, 728–29 (4th Cir. 2008) (grievance

regarding inadequate care for Hep C insufficient for exhaustion regarding inadequate care for gout). *Moore* refused to apply the doctrine when a prisoner "alleg[ed] a pattern of inadequate medical care[] [but] did not give prison officials a fair opportunity to address" the problem because he only complained about treatment for his pancreatic condition and Hepatitis C, not gout. *Id.* at 729. And *Siggers* rejected the doctrine when a prisoner did not "complain[] of a single government failure . . . that occurred to the prisoner on a repeated basis due to that failure." 652 F.3d at 693 (distinguishing facts from *Johnson*, 385 F.3d at 519–21).

Thus, the continuing violation doctrine only applies to longstanding prison policies or conditions and recurring incidents of the same harm. It has never meant that one incident automatically satisfies exhaustion for any future related claims.

## C.

With these rules in mind, we turn to Sheltra's claim. He contends that one incident—threats and extortion—satisfies exhaustion for a future, related incident—the attack. But *Johnson* shows more is required. Sheltra's March 10 grievance provided no notice or opportunity for IDOC officials to remedy the problem of his attack. And he has not experienced a continuing harm such that officials were previously aware of a repeated problem. Thus, Sheltra's claim falls outside the bounds of any court's interpretation of the continuing violation doctrine.

Each case applying the continuing violation doctrine found that filing another grievance would've been "redundant" because officials already knew about the problem. *See*, *e.g.*, *Howard*, 534 F.3d at 1244. Not so here. Had Sheltra filed a grievance after the attack, the substance

of that grievance would have been markedly different than his earlier submissions. Consider what a subsequent grievance would contain. It would have actual details of the attack, the name of the attacker, and any connection to other prisoners previously named. And it also would likely include criticism of the prison's allegedly faulty investigation—which found Sheltra complicit in the extortion ring and ignored any danger to him. A fresh, post-grievance investigation into those allegations "might [have] improve[d] prison administration and satisf[ied] the inmate" thus "obviating the need for [this] litigation" as "Congress expected." *Brown*, 422 F.3d at 936 (discussing purpose of PLRA) (simplified). But because Sheltra ran to federal court before filing another grievance, IDOC officials had no opportunity to investigate the attack or inspect the results of the previous investigation.

And Sheltra didn't experience "one, continuing harm" like in other cases adopting the doctrine. *Cf. Siggers*, 652 F.3d at 693. Those cases involved challenges to years-long policies, *see*, *e.g.*, *Johnson*, 680 F.3d 238–39, or repeated incidents often occurring over months or years, *see*, *e.g.*, *Howard*, 534 F.3d at 1244. Sheltra only complained of threats of extortion in March 2020 and experienced an attack assumedly related to those threats in April 2020. No case has adopted such an expansive view of "continuing harm" when the harm is that discrete and temporary.

The majority glosses over these distinctions because it accepts Sheltra's argument that he experienced an ongoing harm—"prison officials failing to protect him from a specifically identified threat posed by inmates in his housing unit." Maj. Op. 18. But that broad level of generality doesn't fit with other cases applying the doctrine. *See Johnson*, 385 F.3d at 521 n.13. And the majority never

attempts to define what that continuing harm actually was. We ought to require more before adopting an exception to Congress's design.

The majority also misreads *Johnson*. Its import here is not the difference between threats and assaults. Maj. Op. 19. It's that a prisoner's grievance must "alert" officials to a problem and give them an "opportunity to remedy" that problem. *Johnson*, 385 F.3d at 522. That's why an earlier grievance doesn't "automatically" exhaust a later incident of the "same general type." *Id.* at 521 n.13. If it doesn't provide officials with notice and opportunity to fix a continuing problem, a single grievance can't fit with the continuing violation doctrine. *Id.* at 522. Yet the majority skips over these requirements because it considers whether an investigation was conducted as a "merits" determination. But that distorts the entire purpose of exhaustion under the PLRA—to give a prison an "opportunity to correct its own mistakes . . . before it is haled into federal court." *Woodford*, 548 U.S. at 89. By ignoring the purpose of exhaustion and jumping past the facts in this case, the majority imposes some sort of strict liability on prisons under the PLRA—get every investigation right or else be prematurely haled to court.

No court has ever used the doctrine to justify such a sweeping requirement, and we shouldn't have done so today.

\*        \*        \*

Because Sheltra deprived IDOC officials of the time and opportunity to address his attack by failing to exhaust IDOC's administrative remedies, he cannot avail himself of the continuing violation doctrine.

I respectfully dissent.